SUPREME COURT.    New York General Term, October, 1851.
*Edmonds, Mitchell* and *King*, Justices.

HENRY CARNAL plaintiff in error *vs.* THE PEOPLE &c. defendants
in error.

A motion to set aside a stay of proceedings and to quash a writ of error, in a
capital case, may be made by the district attorney; and the prisoner's
counsel can not avail himself of the objection, that such motion should have
been made by the attorney general.

A justice of the supreme court has power to allow a writ of error, and to make
an order staying proceedings, after conviction, in a capital case.

The mode of reviewing a decision of the Oyer and Terminer, as it existed
previous to the adoption of the Revised Statutes, compared with the present
practice.

The prisoner had been tried and convicted of the murder of
Charles M. Rousseau.   A writ of error having been allowed
by Justice Harris with a stay of proceedings, a motion was
made before the supreme court sitting in the first judicial dis-
trict, where the writ was returnable, to quash the writ of error
and to vacate the stay of proceedings.

The grounds of the application are fully set forth in the ·
opinion of the court.

*N. Bowditch Blunt* (district attorney), for the people.

I. The motion is divisible into two branches, one going to
quash the entire proceeding, the other simply to vacate the *stay*
of proceedings.   The motion to quash presents two questions,
one purely legal, resting upon the form and character of the
writ: the other, a mixed question of law and fact.   Upon the
first question, it will be necessary to examine the history ·of
writs of error at common law, and the changes, if any, effected
by the statute.   What then was the province, power and pro-
ceedings of and upon writs of error at common law.   *First.* Its
province was to remove the record for review into the court of
King's Bench, and from the King's Bench to the House of
Lords.   *Second.* Its power was to reverse the judgment in cases

Carnal *v.* The People

*not capital*, for notorious mistake in the judgment, or other parts of the record, and in capital cases to *reverse attainders.* *Third.* In cases of misdemeanors, writs of error were not allowed, of course, but on sufficient probable cause shown to the attorney general or public prosecutor, and then they were grantable of common right and *ex debito justitiæ.* *Fourth.* In *capital cases,* writs of error were only allowed *ex gratia,* and not without express warrant under the king's sign manual, or with the consent of the attorney general. (1 *Chitty, Cr. Law, p.* 749.) *Fifth.* In no case at common law did the writ of error operate as a stay of proceedings. (*Lanett* v. *The People,* 7 *Cowen,* 339; *Rex* v. *Wilkes,* 4 *Burr Rep.* 2527.)

II. Assuming that the judge had no power to grant a stay of proceedings, and the present writ of error containing such *express direction* therein, what is the effect of such provision? Does it avoid the whole writ, or is the direction being a nullity mere surplusage? I conceive the writ itself must be set aside. If the *order* was separate from the writ, *forming no part* thereof, the court might discriminate, but as an essential part of the writ, in the present case, if improperly or illegally allowed, the whole writ must fall. The court can not separate the writ into parts retaining one and rejecting the other—the excess of the authority renders the whole void. The writ is evidently a writ under the 15th and 16th sections, and if inapplicable to the case in hand must fall.

III. The allowance of the writ was obtained by the suppression of material facts, and being a writ *ex gratia,* this court upon a knowledge of such facts, has the power to revoke this exercise of *grace.*

IV. The previous application for a writ of error to a judge in this district, and the subsequent proceedings of the counsel for the convict as connected with *said* application, form an additional reason for vacating the present writ of error. The effect of tolerating or sustaining a proceeding of this description, will be, to encourage tardiness; to reward *willful* delay; and to uphold by subtle refinements and technical abstractions, the

practice of destroying just convictions on the merits; and thus subvert the ends of public justice.

V. Finally, the sustaining of this writ of error, is calculated to pollute the fountains of justice, to destroy the public confidence in our judicial tribunals, and to render our laws, instead of being a terror to evil doers, a byeword and a mockery.

*Fiat justitia, ruat cœlum.*

*H. L. Clinton,* for the prisoner.

*By the Court,* EDMONDS, J.—The prisoner was convicted of murder at the Oyer and Terminer in New York, in March last, and was sentenced to be executed in May. Before the day appointed for his execution, his counsel prepared a bill of exceptions, obtained a reprieve of execution until July, and applied to the judge who presided at the trial for the allowance of a writ of error. Before that application was passed upon, the counsel for the prisoner withdrew it, and gave notice of an application to set aside the conviction on the ground of irregularity, and obtained from the governor a further reprieve, in order to make that motion. On the day following the decision of that motion adverse to the prisoner, his counsel obtained from a judge, out of the district, an allowance of a writ of error on the bill of exceptions, and an order staying all proceedings on the execution until the decision on the writ of error.

In regard to the objection made by the prisoner's counsel against the district attorney's appearing in the case and making this motion, it is enough to say, that under the statute (2 *R. S.* 741, § 21), the district attorney has, at least, concurrent power with the attorney general; and it will be time enough to determine which has paramount authority when a conflict shall arise between them. In the mean time, it is not competent for the prisoner to raise the question. It is sufficient for him that the motion against him is made by one having authority to make it. The main motion is to quash the writ of error, on two grounds. First, because of concealment of material facts from the officer who allowed the writ; and second, because that

Carnal *v*. The People.

officer had no power to allow a writ of error, incorporating into it an order to stay proceedings. In respect to the first point, we took occasion to say, on the argument, that the explanation of the prisoner's counsel was entirely satisfactory. And all that is left us to consider is, whether the judge had power to stay proceedings on the judgment after a sentence had been pronounced. Upon this question, which is one of construction of a statute, we have no aid from adjudications. We have been referred to only one case (*Freeman's*) where such an order has been granted, and in that case the right to grant it seems not to have been a subject of discussion or adjudication.

I confess my first impression on this subject was adverse to the existence of the power. The section of the statute so often referred to (2 *R. S.* 658, § 15) is very explicit in its terms: " No judge, court or officer, other than the governor, shall have authority to reprieve or suspend the execution of any convict sentenced to the punishment of death." " The revisers, in their report recommending the section, say that " the preceding or some other provisions concerning the suspension of executions seem absolutely necessary. Those stated, viz., lunacy and pregnancy, are the only cases where the interference of any other power than that of the governor can be necessary. Without expressing an opinion whether the judge or court possess the power of suspending executions, it is yet deemed an unnecessary power, as the court may suspend judgment in case of doubt, and is so obviously liable to abuse, and conflicts with the powers and duties of the executive, that the exercise should be expressly prohibited." It will be observed that it is " reprieves and suspensions" that are alone forbidden to all others than the governor, and it becomes material to inquire what is meant by those words in the statute. We can gather that meaning from an unmistakeable source. The constitution in force, when the revised statutes were enacted, in art. III, § 5, says he " shall have power to grant reprieves and pardons after conviction for all offences, except treason and cases of impeachment. Upon convictions of treason, he shall have power to

suspend the execution," &c., until the legislature can be consulted.

The revised statute (*vol.* 1, 165, § 3), also enacts, in regard to his granting pardons for all offences and suspending execution in cases of treason; thus showing plainly what reprieve or suspension it was that was to be prohibited to other officers, lest it might "conflict with the powers and duties of the executive." The statute has given a further construction to the terms under consideration. If a convict, under sentence of death, become insane, the sheriff, after certain preliminaries, may "suspend the execution" until the governor shall issue his warrant directing the execution. And so, in case of pregnancy, he may in like manner suspend the execution. The term "reprieve" as applied to convicts, has a definite meaning. It postpones the time of execution to a definite day, while "suspension" is for an indefinite period. It can not be claimed, nor has it been, that the act complained of by the district attorney, in this case, was a reprieve; it was a suspension, if at all, within the statute under consideration. The object of the statute was to prevent a conflict between the executive and other departments of the government.

The power of the governor to grant an absolute pardon needed no protection from the statute, for it was confessedly vested in him, and in him alone. But his power to reprieve, that is, to defer the execution, until a definite time, did require such protection, for it was claimed, and had then recently been exercised by other officers. In *Miller's* case, in 1828, reported in 9 *Cowen*, 730, a court of Oyer and Terminer, after sentence of death had been pronounced, and the time for execution had been fixed, had interfered, by postponing the execution to a day certain and beyond that originally appointed, and had thus, as it was claimed by the governor, "granted a reprieve." The learned judge, whose conduct was arraigned on that occasion, in a letter which has, I believe, received the almost universal approbation of the jurists of our state, claimed that the power existed in the judges of granting reprieves to such time as might be necessary to give room to apply to the executive for

Carnal *v.* The People.

a pardon; that it belonged of common right to every tribunal which was invested with authority to award execution; and was no more an executive than a judicial power. It was to put an end to this claim and exercise of power that the statute in question was recommended and passed. Thus far the origin of the statute has been regarded only as it affected reprieves. There was one case, and only one, in which the governor was authorized by the constitution and the laws to suspend a sentence for an indefinite period, and that was in cases of treason, where the power to pardon was expressly prohibited to him.

Now, as the power claimed by the judges was rested upon grounds broad enough to reach suspensions also as well as reprieves, and as the case of treason was one of those put forth by the presiding judge, in that instance, as one where the power might be exercised, the revisers (and the legislature following their recommendation) deemed it proper to extend its prohibition beyond the case which had actually occurred to one which might occur. It was in substance, therefore, enacted that, as the governor had power in all cases except treason and impeachment, to reprieve for a definite period, the power should not be exercised by any other officer, and that as he had power in cases of treason to suspend for an indefinite period, that power in like manner should not be exercised by any other one. And thus the object of the statute was attained in guarding against conflicts between the executive and judicial departments. I have already remarked that the act complained of in the case before us was not a " reprieve," within the sense of that word as used in the constitution and the statute; and I now add, it is equally manifest that it was not a " suspension" within that sense.

It was, however, claimed on the argument, that even if the strict letter of the statute would bear such construction, it was evidently the intention of the legislature to prohibit the exercise of any power over, or interference with the sentence, by any one other than the governor, and that the act complained of was clearly within the spirit of the statute; and we have not overlooked that view, for it struck us with much force on the ar-

gument; the revisers, in their report, touching this enactment, almost, if not quite, say so; and to ascertain how that is, it is necessary for us to examine somewhat at large the system which they recommended and which was adopted by the legislature. Prior to the revised statutes, there was no bill of exceptions in criminal case and writ of error thereon, for the review of convictions in the Oyer and Terminer; the review was attained in this manner: the court suspended passing sentence, and certified the question, which was in doubt, to the supreme court, who considered and passed upon it, and advised the court below either to grant a new trial, or proceed to pass sentence, and sometimes when the convict was before them, they passed the sentence themselves. Whether the trial should be reviewed was at the option of the court before which it was had, and the jury had not the right as in civil cases to take exceptions, and carry up the record for review.

In case the judge consented to a review, the necessary time for that purpose was given, either by the court suspending its judgment, or, after judgment pronounced, by suspending the execution. The legislature, in the revised statutes, altered this practice, and gave to the prisoner the right to interpose his exceptions, and a right to a review of his case, and they adopted various provisions to carry out their intentions. They gave the party on trial an absolute right to a bill of exceptions. In certain cases the district attorney might sue out a *certiorari*, and so bring the exceptions to the attention of this court, and, on the other hand, the defendant might sue out his writ of error and so bring up the case for review. In all cases not capital, the writ of error was one of right, and the judge was bound to allow it. In capital cases, it was in the discretion of the judge who tried the cause, or any other judge of this court, to allow or refuse the writ. And then, in order to provide the time necessary for a review of the case in the higher court, it was provided, in all cases, that the writ of error should stay or delay the execution of the judgment, or of the sentence thereon, when there was an express direction therein that it should operate as a stay.

Carnal *v*. The People.

Thus a harmonious system was adopted, by which the prisoner's right to have his case reviewed was secured to him, delays, on his part, were provided against, and ample time for such review was provided for. The act of the judge complained of in this case is, that while he thought, in the exercise of the discretion vested in him, that the case was a proper one for review, he provided the time necessary for that purpose, by ordering the execution of the sentence to be stayed until the decision of this court on such review. The section authorizing a judge to order a stay of proceedings, in terms applies to all criminal cases where a writ of error is allowed, and the prior section prohibiting the interference of any officer except the governor in the execution of a sentence, seems to apply to all cases of a reprieve or suspension in a capital case. If the two provisions are in conflict with each other, then the one which I have last named must yield to the other, because prior in its position in the statute, upon the well known rule that the last expression of the legislature is supposed to best declare its intention. But if they can be so construed as to allow both to operate, and they do not necessarily conflict, such construction must be given to them as will allow full force to both. The two sections may, it is true, be made to conflict by a certain construction, but they do not necessarily conflict. On the other hand they may be so construed that both may exist harmoniously together.

Thus, if the section which forbids the interference of a judge is confined to cases where the review or suspension is for purposes other than a review of the case in a higher court, and the section which allows him to grant a stay of proceedings is confined solely to cases where such review is sought, they can exist in unison with each other, and in entire harmony with the whole system. There will then be left with the judges that which is conceded to them in all other cases, civil and criminal, viz. the power to stay proceedings until a review can be had in a higher tribunal; and there will be left to the governor his full power to pardon, suspend or reprieve execution. This construction is commended to our favorable regard, not merely by

Carnal *v.* The People.

the well settled rules of construction as to enactments apparently conflicting, but by the difficulty we encounter in finding any reason why the statute should exempt capital cases from a rule which applies in all other imaginable cases, civil or criminal, important or inconsiderable. But there are still other considerations. In these cases the court before whom the trial is had may suspend all proceedings after conviction, provided they do so before they pronounce sentence, and for the purpose of having the case reviewed. What good reason can be found for denying the exercise of the power for the same purpose, after sentence shall be pronounced?

Again, if the judge who presides at the trial should refuse to allow the writ of error, his decision is not final, but another judge may allow it. Of what use would that be in a capital case, if the proceedings could not be stayed? The allowance of the writ, which would be, in effect, a certificate by a judge of this court, that there was, probably, error in the conviction, would, in such an event, be the cruelest mockery, and the writ be rendered entirely nugatory. This view may be carried still further, by reflecting a moment on the state of things which existed when these statutes were enacted. It was a circuit judge who presided in the Oyer and Terminer. He might think there was no error or doubt in the case, and so refuse either to suspend the judgment, or allow a writ of error. Yet, the chancellor or a judge of the supreme court might think there was error, or at least doubt, and allow the writ of error.

Yet, according to the construction contended for, he (the superior officer) would be obliged to leave the prisoner for execution with that doubt or error hanging around the case, because the inferior officer had said so. There is another consideration to be regarded. Although a writ of error did not, from its nature, operate as a stay of proceedings, yet it had so often and so generally been clothed with that attribute by the English statutes, passed before our revolution, and incorporated into our law, that at the time of revising our statutes, it was generally supposed it would operate *per se.* The revisers so understood it, and hence the enactment is, not that a judge may grant a

Carnal *v.* The People.

stay, but that no writ of error shall operate as such unless it contains in it a direction to that effect.   So that but for that restriction, when the statute gave a writ of error in criminal cases. it might, in the then prevailing opinion, be of itself a stay; and the reprieve or suspension of execution that might thus be worked out, would be, not by the direct interference of " any court, judge or other officer," but by the very nature and office of the high writ.

Again, the statute has made another very important distinction between writs of error in capital and in other cases. In all cases not capital, the writ may be allowed by any county judge, recorder, and supreme court commissioner, and without notice to the public prosecutor, but in capital cases only by the chancellor, judge of the supreme court or circuit judge, the highest of our judicial officers, and then only after notice to the attorney general or district attorney.   Why this distinction, if there was to be no stay of execution?   Was the allowance of the writ of error confined to those officers who are alone trusted by the statute with the power to stay proceedings?   And why, above all, this care and caution about a writ of error, which, when unaccompanied by a stay of proceedings, would become so illusive?   In fine, the granting of pardons, reprieves, and suspending executions in criminal cases, provided for in one of these sections, is now, under our existing constitution and laws purely an executive power, confided to the governor alone; and the staying proceedings upon a judgment in either a civil or criminal case, for the purpose of enabling a party to enjoy fully the benefit of the reprieve which is secured to him, is purely a judicial power, which has always been exercised by the courts, and can not be abandoned without subjecting to great peril the important interests confided to and passed upon in them.   We are, therefore, of opinion that this motion must be denied.