Lonnie Snodgrass v. The State.

No. 1513. Decided February 14, 1912.

Rehearing denied October 16, 1912.

**1.—Theft of Horse—Sufficiency of the Evidence—Alibi.**

Where, upon trial of theft of a horse, the issue was squarely drawn as to whether defendant was the person who stole the horse, the testimony offered by him proving a complete alibi, if the jury had believed it, but the testimony offered by the State supported the verdict of the jury, there was no reversible error.

**2.—Same—Suspension of Sentence—Constitutional Law.**

The Legislature has no authority under the Constitution to confer upon district judges the authority to suspend sentence after a person has been legally convicted of crime, or to extend immunity from punishment under the condition named in the Act of the Third-Second Legislature, chapter 44.

### 3.—Same—Suspension of Sentence—Judicial Power.

The power of the court to suspend the sentence does not conflict with the power of the Governor to grant reprieves, there being a distinction between a reprieve and a suspension of sentence, in that a reprieve postpones the execution of the sentence to a day certain, whereas a suspension is for an indefinite time; but the Act of the Thirty-Second Legislature permits the court to grant an unconditional pardon, although the word "pardon" is not used therein, and is unconstitutional as the pardoning power is conferred by that instrument upon the Governor alone.

### 4.—Same—Power to Pardon—Constitutional Law.

The Act of the Thirty-Second Legislature, chapter 44, under conditions named exempts from punishment persons guilty of crime, and is but an indirect exercise of the power to pardon which by the Constitution is exclusively conferred upon the Governor.

### 5.—Same—Constitutional Power—Co-ordinate Branches of Government.

The legislative, judicial and executive departments each received from the people as expressed in the Constitution that portion of power that the sovereign citizenship deemed necessary and proper to discharge all the functions of government relating to their respective departments and no more, and each is sovereign in the exercise of the powers confided to it, each the equal but not the superior of the other co-ordinate branch of the government.

### 6.—Same—Constitutional Law—Pardoning Power.

The Constitution of Texas having conferred upon the Executive Department the exclusive power to grant pardons, the Act of the Thirty-Second Legislature, chapter 44, seeking to confer this power on the district judges of the State is in violation of that provision of the Constitution, and is null and void.

### 7.—Same—Suspension of Sentence—Power to Reprieve.

While the power to suspend the sentence by the court does not conflict with the power of the Governor to grant reprieves and pardons, the Legislature had no power to confer on the trial court authority to remit the punishment after a conviction had been obtained and the penalty assessed by a verdict of the jury, and said Act under the guise of suspension of sentence can not exercise the power of the Governor to reprieve or pardon.

### 8.—Same—Judicial Construction—Inherent Power of Courts—Benefit of Clergy.

The courts of the other states which hold that the courts have the inherent power to suspend sentence, decline to go to the extent that the court by order entered may entirely remit all punishment, and base the power of suspension of sentence upon the custom of the English courts by whom it was termed a reprieve and who permitted the plea of benefit of clergy to be filed after conviction, but before the punishment had been assessed; but this procedure has no application to the jurisprudence of Texas, and has long since been abolished in England.

### 9.—Same—Constitutional Law—Pardoning Power.

The people of Texas desiring to make it certain that no one except the Governor should ever exercise the pardoning power, apparently being afraid that as first written the power to reprieve might not be ample to stay the hand of the other departments of government, later added in their written constitution that the power to commute the punishment was vested solely in the Governor, clearly making it known that it was not their wish or will that the judiciary of Texas should ever exercise the power and authority exercised by the English courts under the benefit of clergy plea; whatever may be the rule in other jurisdictions under different constitutions and laws, it is not the rule in Texas.

### 10.—Same—Practice in English and Federal Courts.

The practice in the English and Federal courts is that the jury passes

on the guilt of the prisoner, but has nothing to say as to the punishment to be assessed; this is done under the sentence of the court, but in Texas the jury in passing on the guilt of the defendant also assesses the punishment if they find defendant guilty and the judge in pronouncing sentence can neither alter nor amend, increase nor diminish the punishment, but must assess the penalty as fixed by the jury, therefore, the plea of benefit of clergy has never had any place in our system of jurisprudence.

### 11.—Same—Policy of Constitution.

As to the wisdom of the framers of the Constitution of Texas, in giving to one department of government the authority to try offenses and assess the punishment thereof, and to another department the authority to remit the punishment, is not a question for- the courts; however, there were many good reasons therefor.

### 12.—Same—Meaning of the Term "After Conviction."

The contention of appellant that the words "after conviction," mean after the sentence has been pronounced and that the Governor has no right to pardon until the court has pronounced sentence is untenable. Distinguishing Arcia v. State, 26 Texas Crim. App., 193.

### 13.—Same—Judicial Construction—Words and Phrases.

In the case of Arcia v. State, 26 Texas Crim. App., 193, the court was not discussing the meaning of the words "after conviction," as used in the Constitution of Texas, and only limited the decision as it affected the civil rights of the person adjudged guilty of crime and based it upon the peculiar wording of our statutes at that time with reference to appeals and sentences.

### 14.—Same—Legislative Construction—Common Law.

The contemporaneous legislative construction of the meaning of the words "after conviction," is in accord with the meaning of the words as known to the ·common law, and as adhered to by the great weight of authority in this county, and is in accord with the opinion of this court in the Arcia case, supra.

### 15.—Same—Common Law—Conviction for Crime.

Under the common law, a person was said to be convicted of the crime when verdict was rendered thereon adjudging him guilty, but not attainted (a forfeiture of civil rights) until after the punishment had been assessed by the judgment and sentence of the court; thus it is seen that the terms, "after conviction," under our Constitution do not embrace the sentence, but simply the guilt of the defendant who is subject to pardon after conviction.

### 16.—Same—Right of Appeal—Final Conviction—Statutes Construed.

Under the Act of the Thirty-Second Legislature, the question of the right of appeal is not involved as thereby no right of appeal shall exist, and after conviction no additional step is authorized to be taken by any tribunal in determining the guilt of the accused, and therefore, the conviction is final.

### 17.—Same—Judicial Construction—Common Law—Forfeiture of Civil Rights.

Under the common law a man did not forfeit his civil rights until after he had been attainted and this followed the sentence, although he might be convicted of the offense by verdict of the jury; and in the Arcia case, supra, this court limited its holdings to a forfeiture of civil rights and it has so been held in all subsequent decisions, which are not, therefore, in conflict with the opinion in this case; but under the above Act, the right of appeal is taken from a defendant when the court suspends sentence thereunder, and the conviction is, therefore, a finality.

### 18.—Same—Statutes Construed—Practice in English Courts.

The Act of the Thirty-Second Legislature, chapter 44, is drawn in accord--ance with the practice of the English courts under the benefit of clergy plea as known in the eighteenth century (just before its abolishment in that country), except there is added to the provisions the right to later

recall the judgment of clemency and inflict the original punishment for some act thereafter committed. This was never known or practiced at common law and is entirely foreign to the jurisprudence of Texas and contrary to our Constitution.

#### 19.—Same—Suspension of Sentence—Reprieve—Pardon.

This character of sentence or reprieve was never exercised by the common law courts and is unknown to both the English jurisprudence and that of this country; it is a misnomer, and gives to these words a meaning unknown to the law and unauthorized by any lexicographer. The pardoning power in England can only be exercised by the King, and in Texas by the executive, under our Constitution.

#### 20.—Same—Definition of Pardon.

A pardon is an act of grace which exempts the individual on whom it is bestowed from the punishment the law inflicts for a crime he has committed; this power is exclusively conferred upon the executive of this state and can not be conferred upon the courts as is attempted by the Act of the Thirty-Second Legislature, which is, therefore, clearly unconstitutional.

#### 21.—Same—New Trial—Motion for New Trial.

That portion of appellant's brief relating to the power of a court to grant a new trial need not be discussed, as the Act in question does not contemplate another trial of the defendant; however, the rule of law in this State is, where no motion for new trial has been filed before the end of the term at which the judgment is entered, no court has the power or authority to grant a new trial or change its judgment at a subsequent time.

#### 22.—Same—Constitutional Law—Forfeiture of Rights or Privileges.

The Act of the Thirty-Second Legislature, chapter 44, is also violative of section 2 of article 16 of the Constitution of Texas, wherein it is provided that persons adjudged guilty of certain offenses shall forfeit certain rights and privileges.

#### 23.—Same—Suggestion of Remedial Legislation.

See opinion suggesting a law that, where it appears in the trial court that the offense is the first one of which defendant may be convicted, the court may make recommendations to the Governor for a conditional pardon.

#### 24.—Same—Constitutional Law—Practice on Appeal.

The Constitution of Texas is the supreme law of the State and can not be frittered away by technical judicial construction, and this court will take the Constitution as its guide and uphold it in all its provisions.

Appeal from the District Court of Erath. Tried below before the Hon. W. J. Oxford.

Appeal from conviction of theft of horse; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*C. E. Lane,* Assistant Attorney-General, and *C. F. Greenwood,* for the State.—No person is finally "convicted in this State, until he is sentenced and accepts his sentence, and does not appeal his case, or in the event that he does appeal, he is not convicted until the court of last resort affirms his conviction, and that the Governor of this State has no authority to grant him a pardon until one or the other of these conditions precedent exist.

"It is the sentence, and not the judgment, which under our code,

concludes the prosecution finally in the trial court, and until sentence has been pronounced, the conviction in the trial court is not complete so as to work a forfeiture of civil rights, and a party is not convicted until he has been sentenced and has taken no appeal from said sentence."

It is manifest, that until a convicted defendant has been finally sentenced, his status as a citizen has not been affected. He does not need a pardon from the Governor. He is not a supplicant for executive favor or grace in any particular. He does not need a pardon, because he is not a "convict." He stands in no need of a reprieve, commutation of punishment or a pardon, because his citizenship has in no wise been affected by a preliminary verdict of guilty.

We insist with all the emphasis of which we are capable, that there must be a subject upon whom a pardon can operate, before there can be a pardon. In the absence of a "convict" there can be no pardon. A "pardon" is intended to affect the person to whom it is granted, and to restore him to his original position. The Governor is clothed with the high prerogative of the "pardoning power," but certainly he can not exercise it, until he can find a convict, upon whom he may confer executive grace, and a pardon issued by him under the laws of Texas to a person who has not been finally convicted would be void.

The fundamental question underlying this whole matter, was passed upon by this court as far back as 1888, in the case of Arcie v. The State, 26 Appeals, 193. Article 27, Penal Code; Articles 730, 791, 792, 793, 794, Code Criminal Procedure; Evans v. State, 35 Texas Crim. Rep., 485; Hurley v. State, id., 282; Robinson v. State, 36 Texas Crim. Rep., 104; Stanley v. State, 39 id., 482; Foster v. State, id., 399; Underwood v. State, 38 id., 193; Camron v. State, 32 id., 180; Ex parte Mann, 39 id., 491; Kingsbury v. State, 37 id., 259; Jones v. State, 32 id., 135; Rice v. State, 50 id., 648; Wright v. State, 40 Texas Crim. Rep., 135, 45 S. W. Rep., 723; Luna v. State, 47 S. W. Rep., 656; United States v. Athens Armory, 35 Ga., 344; Jones v. Alcorn Co. Registrars, 56 Miss., 766; Peoples v. Bowen, 43 Cal., 439; In re William N. Campion v. Nebraska, 112 N. W. Rep., 585.

The power and authority of a court to suspend a sentence and hold the same in abeyance, was directly passed upon in January of the present year, by the Supreme Court of Mississippi, in the case of Fuller v. The State. 1 Bishop New Criminal Pro., section 1299, p. 799; People v. Court of Sessions of Monroe Co., 141 N. Y., 288, and cases therein cited; Ex parte Garland, 4 Wall., 332; Ex parte Wells, 18 How., 307; Article 833, 837, Code Crim. Procedure; 29 Cyc. Law and Procedure, p. 1003.

*B. E. Cook* and *J. C. George,* for appellant.—On the question of the constitutionality of the Act of the Thirty-Second Legislature:

People v. Brown, 19 N. W. Rep., 571; People v. Patrick, 50 Pac., 425; Clampitt v. United States, 89 S. W. Rep., 666; Weber v. State, 51 N. E. Rep., 116; In re Flint, 71 Pac., 531; Webster v. State, 43 Ohio State, 696; People v. Ct. of Sessions of Monroe Co., 141 N. Y., 288; George v. Lillard, 51 S. W. Rep., 793.

HARPER, JUDGE.—Appellant was charged with the theft of a horse from O. T. Cline. When tried he was convicted, and his punishment assessed at two years confinement in the penitentiary.

There are but two grounds presented in the motion for a new trial, the first thing being that the evidence is insufficient to support the verdict, and the other is that the court erred in not submitting to the jury, at the request of defendant, the issue as to whether defendant had ever before been convicted of a felony, defendant having requested that he do so under the provisions of the law as passed by the Thirty-Second Legislature, being chapter 44. The court endorsed on said application refused, because he saw no equities for defendant if he is guilty. Appellant excepted to the action of the court in refusing to submit that issue to the jury.

1. As to the first ground, there is no question but what the horse of Mr. Cline was stolen on the night of the 16th or morning of the 17th of May. Mr. Peak testified that he was in the livery business at Morgan. That in the month of May, not remembering the date of the month, but on Thursday or Friday of the week, "a boy came to his stable leading the horse stolen from Mr. Cline, and offered to sell the horse to him, and that he recognized the defendant as the same boy that came to his stable with the horse. That he had seen the boy in jail when he was a witness before the grand jury and recognized him out of two or three others in the jail as the same boy." J. A. Crawford testified he lived at Morgan, and saw a man leading the horse through an alley to the livery stable, and talked to him; that he noticed closely because of his proposal to sell the horse so cheap, saying: "I did not see the boy any more after that until I came here as a witness before the grand jury at this term of the court, when I saw him in the jail, and there I took him to be the same party I saw at Peak's barn with the horses. There could be two men just alike, of course. I looked at him closely in the jail. What attracted my attention to him was the way he acted and manuevered around and the price he put on the horses, and he was nervous, and seemed to want to go away, and wanted to know too much about where Mr. Peak had gone. To the best of my knowledge the defendant is the same man I saw at Peak's stable in Morgan with the horses, as described. 'I have no doubt in my own mind, but a man could be mistaken.' 'In my own mind I have no doubt about it.'"

J. B. White testified that he was constable of the Morgan precinct, and when Mr. Peak came to him he went and talked to de-

fendant, saying as well as he remembered it was on Thursday about May 18th when he saw the boy with the horses in Morgan, saying the young man who had the horses looked like defendant. On cross-examination he said: he went to the jail for the purpose of identifying the man. There were two other men in jail with defendant, but neither of them resembled the Morgan man, but he thought defendant did resemble him. As to whether he could be mistaken in his identity of the defendant, he said he would not be positive about it.

When the marshal of Stephenville went to Morgan to see about the horses, these three witnesses described the young man who had the horses, and from this description the marshal arrested defendant. The horse was stolen at Stephenville, and carried to Morgan, a distance of about fifty miles. Defendant offered testimony to show that he was at home in Stephenville on the 15th, 16th and 17th of May, and went from home to Dublin on the night of the 17th, and two witnesses testify that he spent Thursday the 18th in Dublin.

The issue was thus squarely drawn as to whether defendant was the person who stole the horse, the testimony offered by him proving a complete alibi, if the jury had believed it. But under appropriate charges the jury find against him. The testimony offered by the State, as shown above, would justify such finding, and under our judicial system, the jury being the judges of the credibility of the witnesses and the weight to be given their testimony, we never feel inclined to disturb their verdict on an issue of fact where there is evidence to support their finding. Mr. Peak positively identifies him as the man in possession of the stolen horse, and the other witnesses who saw the man at Morgan with the horse support him.

2. As to the other question, that the court erred in refusing to submit to the jury the question as to whether or not defendant had theretofore been convicted of a felony, their finding to be the basis of an application to the trial judge to suspend the sentence under the provisions of Chapter 44 of the Acts of the Thirty-Second Legislature, presents a question of some difficulty. Said Act reads:

"Section 1. That when there is a conviction of any felony in any District Court of this State, except murder, rape, perjury, burglary, and burglary of a private residence, robbery, arson, seduction, bigamy, and abortion, the court may suspend sentence upon application made therefor in writing by the defendant when the punishment assessed by the jury shall not exceed five years confinement in the penitentiary; provided, that in no case shall sentence be suspended except when the proof shall show and the jury shall find in their verdict that the defendant has never before been convicted of a. felony in this State or in any other jurisdiction.

"Sec. 2. The court shall submit the question as to whether the defendant has ever before been convicted of a felony, only upon re-

quest in writing by the defendant, and when the issue is raised by the evidence.

"Sec. 3. When sentence is suspended at the request of the defendant no appeal shall lie from the judgment of conviction.

"Sec. 4. Upon application for suspension of sentence, the court may hear evidence as to the reputation of the defendant as a law-abiding citizen, and as to whether the defendant has ever been before convicted of a felony, and upon any other matter that may in its judgment enable it to arrive at a proper conclusion; and the suspension of the sentence, or the refusal to do so, shall be wholly within the discretion of the trial court, and the exercise of such discretion shall not be subject to review in any court; provided that in no case shall sentence be suspended unless the jury recommend it in their verdict.

"Sec. 5. When sentence is suspended, the judgment of the court on that subject shall be that sentence on the judgment of conviction shall be suspended during the good behavior of the defendant. By the term 'good behavior' is meant that the defendant shall not be convicted of any felony during the time of such suspension or any misdemeanor that involves moral turpitude that the court who granted such suspension may deem not good behavior.

"Sec. 6. Upon the final conviction of the defendant of any other felony or misdemeanor as provided in Section 5 of this Act, pending the suspension of sentence, the court shall cause proper process to issue for the arrest of the defendant, if he is not then in the custody of said court, and upon the execution of the capias, and during a term of the court, shall pronounce sentence upon the original judgment of conviction, and shall cumulate the punishment of the first with the punishment in any subsequent conviction or convictions.

. "Sec. 7. In any case of suspended sentence, upon the expiration of double the time assessed as punishment by the jury, the defendant may apply to the court, in term time, to have the judgment of conviction set aside; and if it shall appear to the court, upon the hearing of such application, that the defendant has not been convicted of any other felony, and that there is not then pending against him any charge of felony, the court shall enter an order reciting the facts, and that such judgment of conviction be set aside and annulled. After the setting aside of any judgment of conviction as herein provided for, the fact of such conviction shall not be shown or inquired into in any court for any purpose, except in such cases where the defendant has again been indicted for a felony, and in such event such prior conviction may be shown in case the defendant invokes the benefit of this Act.

"Sec. 8. When sentence is suspended, the defendant shall be released upon his own recognizance, in such sum as may be fixed by the court."

If the law is valid, it appears upon the written request of defend-

ant, when the issue is raised by the evidence, the court shall submit
to them the question of whether or not the defendant has thereto-
fore been convicted of a felony. This part of the law seems to be
mandatory on the judge, and if the jury find that this is the first
offense, and the punishment is for less than five years, it then be-
comes discretionary with the court as to whether or not he will
suspend the sentence. The questions arise, has the Legislature the
authority to confer upon district judges the authority to suspend
sentence after a person has been legally convicted of crime, and has
the Legislature the authority to confer on district judges the power
to extend immunity from punishment under the conditions named in
the Act? This law not only gives to district judges discretionary
power to suspend the sentence of a person after he has been legally
convicted of an offense, but also after lapse of time, upon a showing
that he has been guilty of no other offense, to set aside the judgment
of conviction, thus in terms conferring on them the power to grant
pardons to persons convicted of crime.

Our Constitution provides in Sec. 11, Art. 4: "In all criminal
cases, except treason and impeachment, he (the Governor) shall
have power, after conviction, to grant reprieves, commutations of
punishment and pardons; and under such rules as the legislature
may prescribe he shall have power to remit fines and forfeitures.
With the advice and consent of the Senate he may grant pardons in
cases of treason, and to this end he may respite sentence therefor,
until the close of the succeeding legislature."

That the Legislature has the power, being the representative of
sovereignty, to confer this power on the courts can not be questioned,
unless inhibited by the provisions of the Constitution. It specifically
confers upon the Governor the authority to pardon, reprieve and
grant commutations of punishment.

That the power to suspend the sentence does not conflict with the
power of the Governor to grant reprieves is settled by the decisions
of the various courts, it being held that the distinction between a
"reprieve" and a suspension of sentence is that a reprieve postpones
the execution of the sentence to a day certain, whereas a suspension
is for an indefinite time. (Camal v. People, 1 Parker Cr. Rep., 262;
In re Buchanan, 40 N. E., 883, and cases cited in 7 Words & Phrases,
page 000.) This law can not be held in conflict with the power
confided in the Governor to grant commutations of punishment, for
a commutation is but to change the punishment assessed to a less
punishment. A pardon, however, is held to be an act of grace pro-
ceeding from the power entrusted with the execution of the laws
which exempts the individual on whom it is bestowed from the pun-
ishment the law inflicts for a crime which he has committed. This
Act by its provisions provides that after a person has been legally
convicted of a crime, and his sentence suspended under the provi-
sions thereof, upon the expiration of double the time assessed as pun-

ishment by the jury, the defendant may apply to the court to have the judgment of conviction set aside, and if it appears that he has not been convicted of *any other offense,* the judgment of conviction shall be set aside and annulled, thus giving to the District Courts the power and authority to exempt from punishment a person legally convicted of crime, and of which he has been adjudged guilty, and to which our laws affix a penalty. By the act of setting the judgment aside such person would also be restored to all the rights and privileges to which one is entitled who has never been convicted of an offense. In other words, this Act of the Legislature grants to such a person an unconditional pardon, although the word "pardon" is not used therein, and this necessarily includes the question, can the Legislature bestow upon any officer, other than the Governor, the power to grant an unconditional pardon? We have carefully examined the decisions in those states having constitutional provisions similar to our own, and it seems that an unbroken line of decisions hold that the power can not be granted to any other person or agency, where the Constitution of the State confers the power on the Governor. In the case of Butler v. State, 97 Ind. 375, it is held:

"Article 3 of our State Constitution, section 96, R. S. 1881, distributes the powers of the government into three separate departments, the legislative, the executive, including the administrative, and the judicial, and provides that 'no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in this Constitution expressly provided.' Section 17 of article 5 (section 143, R. S. 1881) confers upon the Governor 'the power to grant reprieves, commutations, and pardons, after conviction, for all offenses except treason and cases of impeachment, subject to such regulations as may be provided by law.' It also invests him with 'power to remit fines and forfeitures, under such regulations as may be prescribed by law.' There is no express provision of the Constitution providing for the exercise of these powers by any person charged with official duties under the legislative or judicial department. The conclusion seems to be inevitable that in this State the Governor, under such regulations as may be provided by law, has the exclusive power to grant pardons, reprieves and commutations, and to remit fines and forfeitures. It follows that any legislative enactment which attempts to clothe the courts, or any of the courts, of this State with these powers, or any of them, is void as being in conflict with the fundamental law.

"The State v. Sloss, 25 Mo., 291, was a case arising upon an Act of the Legislature attempting to relieve persons from penalties incurred by violations of a certain penal statute. It was held that it was not competent for the Legislature to do this, as it was an invasion of the pardoning power which, by the Constitution of the State, was vested exclusively in the Governor. It was said in that case: 'The powers of the General Assembly are not unlimited. All the

departments of our government are confined in their operations. They have prescribed limits, which they can not transcend. The union of the legislative, executive and judicial functions of government in the same body, as shown by experience, had been productive of such injustice, cruelty and oppression that the framers of our Constitution, as a safeguard against those evils, ordained that the powers of government should be divided into three distinct departments, and that no person charged with the exercise of powers properly belonging to one of these departments should exercise any powers properly belonging to either of the others, except in the instances expressly directed or permitted by the Constitution. Although questions have sometimes arisen whether a power properly belonged to one department of government or another, yet there is no contrariety of opinion as to the department of the government to which the power of pardoning offenses properly appertains. All unite in pronouncing it an executive function. So the framers of our Constitution thought, and accordingly vested the power of pardoning in the chief executive officer of the State."

"In The Attorney General v. Brown, 1 Wis., 513, the court said: 'The policy of our Constitution and laws has assigned to the different departments of the State government, distinct and different duties, in the performance of which, it is intended that they shall be entirely independent of each other; so that whatever power or duty is expressly given to, or imposed upon the executive department, is altogether free from the interference of the other branches of the government. Especially is this the case, where the subject is committed to the discretion of the chief executive officer, either by the Constitution or by the laws. So long as the power is vested in him, it is to be by him exercised, and no other branch of the government can control its exercise.'

"The Legislature of Alabama passed a special Act requiring a county treasurer to refund to certain sureties money which they had been compelled, by judgment of court, to pay as a fine for their principal. In Haley v. Clark, 26 Ala., 439, it was held that the act was an attempt indirectly to remit a fine, and was in conflict with the Constitution. The following language occurs in the opinion: "The principal question is, whether this Act is unconstitutional. By article IV, section II, of the Constitution of Alabama, the power to remit fines and forfeitures is given to the Governor, and by the second article, the powers of the government are divided into three distinct departments—the legislative, executive and judicial, and no one of these departments, or person belonging thereto, can exercise any power properly belonging to either of the others, unless expressly directed or permitted by the Constitution. The power to pardon offenses, except in case of treason and impeachment, and to remit fines and forfeitures, being as we have seen, confided by the fundamental law

to the executive branch of the government alone, this power is virtually denied to any other department, and can not, therefore, be exercised by the Legislature.'

"Article 3 of the Constitution of Indiana, while too plain to admit of construction, has in several cases been considered by this court, and the law is well settled that constitutional restraints are overstepped where one department of government attempts to exercise powers exclusively delegated to another. Wright v. Defrees, 8 Ind., 298; Waldo v. Wallace, 12 Ind., 569; Trustees, etc. v. Ellis, 38 Ind., 3; Columbus, etc. R. W. Co. v. Board, etc., 65 Ind., 427.

"Section 50, 2 R. S. 1876, p. 382, and section 1724, R. S. 1881, recognize the power of courts to remit forfeitures of recognizances. We are satisfied such power does not exist in, and that it can not be conferred upon the courts by the Legislature. Courts may, from inherent powers or those conferred by statute, set aside judgments forfeiting, or upon forfeited recognizance, the same as other judgments, for fraud, mistake, inadvertence, surprise or excusable neglect, or in proceedings for review. But courts have not, nor can the Legislature confer upon them, authority to grant pardons, reprieves or commutations, nor to remit fines and forfeitures. These powers, under the Constitution, belong exclusively to the chief executive officer of the State, and they can not be exercised, directly or indirectly, either by the legislative or judicial department."

In the case of People v. Brown, Mr. Cooley, who wrote the standard work "Cooley on Constitutional Limitations," while Chief Justice of Michigan, said: "A judge can not by suspending a sentence indefinitely practically pardon a prisoner." The Supreme Court of the United States, through Chief Justice Marshall, in the case of the United States v. Wilson, 7 Pet., 150, says: "The Constitution of the United States gives to the President the power to grant reprieves and pardons for offenses against the United States. As this power had been exercised from time immemorial by the executive of that nation, whose language is our language, and to whose judicial institutions ours bears a close resemblance . . . A pardon is an act of grace *proceeding from the power entrusted with the execution of the laws* which exempts the individual from the punishment the law inflicts for a crime he has committed."

This Act of the Legislature authorizes judges, under conditions named, to exempt from punishment men guilty of crime, and is but an indirect exercise of the power to pardon. The sovereignty of the State is in its citizens. They have assembled in convention and distributed their sovereign power between the departments of government, conferring upon each all the powers they deemed necessary and proper, and to maintain the independence of each department and the distinctiveness of its sphere, have declared that no "person or collection of persons, being one of these departments, shall exercise any power properly attached to either of the others, except in the

instances herein expressly provided." The legislative, judicial and executive departments each received from the people that portion of power that the sovereign citizenship deemed necessary and proper to discharge all the functions of government relating to their respective department and no more, and each is sovereign in the exercise of the powers confided to it, each the equal but not the superior of the other coordinate branch of the government. The legislative branch has more extended jurisdiction, and its province is to enact laws for the government and well-being of society, and to make any and all laws wherein they are not inhibited by the Constitution. But further that department can not go, nor can it invade or exercise the powers conferred upon either of the other departments. The Constitution having conferred upon the executive department the power to grant pardons, this Act of the Legislature seeking to confer this power on the district judges of the State is in violation of that provision of the Constitution, and is null and void. There are other features of this law that would, in our opinion, render it void, but we do not deem it necessary to discuss them here, as it would necessitate making this opinion too lengthy.

The law had a humane object, a worthy purpose, and if it were possible under our Constitution to uphold it, we would be glad to do so, but deeming it violative of the provisions of the organic law, we hold that the Act is void, and the court did not err in refusing to submit the question to the jury.

The judgment is affirmed.

*Affirmed.*

PRENDERGAST, JUDGE.—I am inclined to believe the Act of the Thirty-Second Legislature quoted in the opinion is constitutional. At least, I have such doubt that I am unwilling to agree to the opinion declaring it unconstitutional.

ON REHEARING.

October 16, 1912.

HARPER, JUDGE.—At the last term of this court this case was affirmed, and is now pending on a motion for rehearing, appellant insisting that this court erred in holding that Chapter 44 of the Acts of the Thirty-Second Legislature was unconstitutional. Owing to the wide and deep interest taken in this question, by invitation of this court, able attorneys, in addition to the learned counsel originally retained, appeared in behalf of appellant, and at their suggestion more time than usual was granted in which to present the motion for rehearing. After oral argument thereon, again at the suggestion of counsel additional time was granted in which they could present their written briefs, and the written briefs being received so near the end of the term, we carried the case over that we might, during

our vacation, give to the questions raised and presented that study, research and thought which their importance justly entitled them to.

Counsel is in error in stating that we held that the trial court could not for any reason suspend pronouncing sentence in a case. In the original opinion we said and held: "That the power to *suspend* the *sentence* does not conflict with the power of the Governor to grant reprieves and pardons is settled by the decisions of the various courts." What we did hold was that the Legislature had no power to confer on the trial court authority to remit the *punishment after a conviction had been obtained and penalty assessed by a verdict of the jury,* this power being conferred on the Governor by the Constitution, and if under the guise of "suspension of sentence" this object was sought to be obtained, the Act woud be void, for the word "suspension" could not be given such construction. Had counsel read and digested the opinion, much that has been written in their briefs would have been unnecessary. Counsel lay down the proposition: "The act of the trial judge in *postponing,* or *holding in abeyance* the *passing of sentence* upon a defendant, is not, and can not be a *'pardon'* or in the nature of a pardon," and then argue at length the proposition, and cite us the opinion of the Supreme Court of the State of Mississippi, in the case of Fuller v. The State, decided recently, and the case of People v. Court of Sessions of Monroe County, reported in 141 New York, 288, and some other cases announcing that a court for good cause shown may *temporarily suspend* pronouncing sentence on a person adjudged guilty by the verdict of a jury. If this was all the law under consideration did, perhaps counsel's premise might be well taken. In the Mississippi case the power of the court to remit the penalty assessed by the jury did not arise and was not discussed. In that case Fuller had been adjudged guilty of the offense with which he was charged by a verdict of the jury. Owing to illness the judge did not at once pronounce sentence, but permitted the defendant to go at large on his own recognizance. However, at a subsequent term of the court, the court had the defendant brought before him, and sentenced Fuller to undergo the penalty assessed. Fuller sued out a writ praying for his discharge, alleging that the court having failed to pronounce sentence at the term at which he was convicted, the court was powerless to pronounce sentence at a subsequent term, and for this reason he was entitled to be discharged. The Supreme Court of Mississippi held against this contention, and required Fuller to undergo the punishment assessed against him. Thus it is seen that the opinion in that case passes on no question arising in this case, for the question of the power of the court to remit the penalty and release the defendant from all punishment for the crime of which he had been adjudged guilty did not arise.

In the New York case, People v. Court of Sessions, it likewise is not in point, for while that case holds that a court has the

inherent power, flowing to it from the common law of England, to suspend sentence, yet it also holds: "The power to suspend the judgment during good behavior, if understood as expressing a condition, upon the compliance with which the *offender would be absolutely relieved from all punishment,* and freed from the power of the court to pass sentence, is open to more doubt. The legislature can not authorize the courts to abdicate their own powers and duties, or to tie their own hands in such a way that, after sentence has been suspended, they can not, when deemed proper and in the interest of justice, inflict the proper punishment in the exercise of a sound discretion. Nor can the free and untrammeled exercise of this power or the right to pass sentence according to the discretion of the court *be made dependent upon compliance with some condition* that would require the court to try a question of fact before it could render the judgment which the law prescribes. The statute must not be understood as conferring any new power. The court may suspend sentence as before, but it can do nothing to preclude itself or its successor from passing the proper sentence whenever such a course appears to be proper." Thus it is seen that the case cited by appellant would render the Act in question void, for this Act requires the court, after suspending sentence, to try an issue of fact, whether or not he has been guilty of another offense, before it would be authorized to pronounce sentence, and also holds that if the Act contemplated the *remission of all punishment,* it would be subject to doubt. However, appellant insists that this part of the opinion is but dicta and of no binding force. If it should be said to be dicta in that opinion, certainly it can not be said to be dicta in the case of People v. Morrisette, 20 How. Prac., 118 (another New York case) wherein it was held: "I am of the opinion the court does not possess the power to suspend sentence indefinitely in any case. As I understand the law, it is the duty of the court, unless application be made for a new trial, or a motion in arrest of judgment be made for some defect in the indictment, to pronounce judgment upon every prisoner convicted of crime by a jury, or who pleads guilty. An indefinite suspension of the sentence prescribed by law is a quasi pardon, provided the prisoner be discharged from imprisonment. No court in the State has any pardoning power. That power is vested exclusively in the Governor."

While this latter opinion is not from the court of final resort in New York, yet no decision from that State has been cited by appellant, and we have found none, where under the guise of suspending the sentence the judge had attempted to relieve from all punishment a person adjudged guilty of crime, that had been sustained by the court of final resort in that State. The object and purpose of the law under consideration in this case was not to authorize a suspension of sentence as understood and practiced by the courts, but its sole object and purpose is to authorize a trial court to relieve of

all punishment a person legally adjudged guilty of crime and whose term of imprisonment had been fixed by the jury in their verdict. In fact, the great weight of authority in the United States is against the authority and power of a court to arbitrarily indefinitely suspend pronouncing sentence when a person charged with crime has been adjudged guilty by a jury, and some courts have gone to the extent of holding if the court fails to pronounce sentence at the term at which the verdict was rendered, it was powerless to subsequently pronounce a sentence. In the case of United States v. Wilson, 46 Federal Rep., 749, the court held that the trial court having suspended sentence at the term at which the defendant was convicted, it was powerless at a subsequent term to pronounce sentence. The court says: "The questions for determination are, first, the power of a court to indefinitely suspend sentence, and, next, to revoke such order of suspension and to proceed to judgment. There can be no doubt of the right of a court to temporarily suspend its judgment, and continue to do so from time to time in a criminal cause, for the purpose of hearing and determining motions and other proceedings which may occur after verdict, and which may properly be considered before judgment, or for other good cause. In this cause however, the record does not show that the suspension was for any such reason, or for a certain or short time, but on the contrary, it appears it was for such uncertain time as the defendant should continue to remain so favorably impressed with the laws of the land as to obey them. Instead of this being a mere suspension of sentence, it operated as a condonation of the offense, and an exercise of the pardoning power, which was never conferred upon the court."

In the case of People v. Allen, 155 Ill., 61, it is held: "Sentence indefinitely suspended upon a plea of guilty can not be lawfully imposed by the court more than three years afterwards, during which time the defendant has been permitted to go at liberty," citing a number of authorities, among them being Cobbey on Crim. Law, 390-392, that author stating: "No court has authority to suspend sentence indefinitely against criminals who have been found guilty by a jury or have pleaded guilty." Judge Cooley, who is recognized as one of the ablest lawyers and writers on limitations of the Constitution, and powers conferred thereunder, when a member of the Supreme Court of Michigan, in the case of People v. Brown, 54 Mich., 15, held, that no judge had the power by suspending sentence of a convicted criminal to relieve him of all punishment; that this would be an invasion of the pardoning power conferred by the Constitution on the Governor. He says: "It is no doubt competent for a criminal court, after conviction, to stay for a time its sentence to give opportunity for a motion for a new trial, or in arrest of judgment, etc., but it was not a suspension of this sort that was requested, it was not a mere postponement, but it was entire and absolute remission of all penalty and the excusing of all guilt." This

he says the court has no authority to do, and for it to attempt to exercise that power would be usurping the functions of the executive of the State, for it, in effect, is the granting of a pardon.

In the case of Neal v. The State, 104 Ga., 509, this question is discussed at length, and the authorities collated, both pro and con, and it is held that a court has no such power, and an attempt to exercise it would be an invasion of the power conferred on the Governor to grant reprieves and pardons. See also State v. Voss, 80 Iowa, 467; In re Markuson, 5 N. Dak., 180; In re Webb, 89 Wis., 354; People v. Blackburn, 6 Utah, 347; People v. Barrett, 67 N. E. Rep., 23. And in a note to the case of People v. Cummings, 14 L. R. A. 285, the editor, after reviewing the authorities, states that while criminal courts have at times assumed this power, it *must be conceded on a careful review of the authorities* that the right of any court to make an indefinite suspension of sentence does not inherently exist in any court. However, even those courts that hold a court may suspend the sentence, also hold that the right of the court to subsequently pass sentence must not be abridged, and none we have been able to find hold that a court in suspending sentence may go to the extent of remitting the penalty entirely, except the courts of North Carolina, where it is held that the rule in force in England under what is termed "Prayer of Benefit of Clergy" is part of the American common law, and in the absence of a statute prohibiting the courts from exercising this authority, the court may change, alter or remit the punishment even after a defendant has been adjudged guilty by a jury and sentence passed. However, the Supreme Court of that State admits in Crook v. The State, 117 N. C., 763: "*We search in vain* for direct authority emanating from the courts of other states to aid us in determining the precise meaning of such orders, because it has not been the practice elsewhere." However, the courts of that State, and the courts of other states, which hold the courts have the inherent power to suspend sentence, decline to go to the extent that the court by order entered may entirely remit all punishment, and all base this power of suspension upon the custom of the English courts by whom it was termed a reprieve and who permitted the plea of benefit of clergy to be filed after conviction, but before the punishment had been assessed, and it may be of some interest to take a cursory view of that plea. In the early days of England a person upon trial as to his guilt or innocence was not permitted to introduce any witnesses to prove himself innocent of an offense charged against him, nor in mitigation of the punishment. The Crown introduced its evidence to prove his guilt, and if that testimony showed his guilt to the satisfaction of the jury, they so found. If the court had a doubt of his guilt from the testimony, it could not grant a new trial on that ground, and no appeal was then permitted on this ground. Under this condition the plea of "Benefit of Clergy" arose. It was first claimed by offi-

cials of the church alone, who claimed the right to be tried in the ecclesiastical court. This plea was then permitted to all persons eligible to clerk or other position in the church—that is, all men who could write—and finally broadened to apply to all persons charged with crime. Not being permitted to offer testimony showing his innocence on the trial, nor offer testimony in mitigation of the punishment, after being found guilty by verdict, when granted the "benefit of clergy" persons adjudged guilty of crime were first permitted in the ecclesiastical court to expurgate themselves, or prove their innocence and offer evidence in mitigation. Later the courts that tried the cases, after verdict but before assessment of punishment by sentence, would permit a defendant to introduce testimony in mitigation of the punishment to be assessed by the sentence or judgment of the court, and under this system there grew up the custom of suspending the sentence until the evidence was heard under this plea so that the court might have the benefit of it in arriving at the punishment he would assess. Upon hearing this testimony the court frequently refused to inflict the death penalty, which was virtually the penalty for all felonies, and would only assess a penalty of burning in the hand to mark the man; later, burning in the face, and still later sentencing the person adjudged guilty to transportation to America or some other point beyond the seas, and other penalties. From this power of the courts of England, claimed and exercised in an early day, must we look to any inherent power in a court to ameliorate or relieve any person of punishment adjudged guilty of an offense? In Chitty's Crim. Law, the rule at that time is said to have been: "By the common law the prisoner was not even permitted to call witnesses, but the jury was to decide on his guilt and innocence according to their judgment upon the evidence in support of the prosecution. And though the practice of rejecting evidence for the prisoner was abolished about the time of Queen Mary, yet the witnesses could not be sworn in behalf of the prisoner, but were merely examined without any particular obligation and therefore obtained but little credit with the jury." In his work he recites that Queen Mary in appointing Sir Richard Morgan Chief Justice of the Common Pleas, enjoined him "that notwithstanding the error of the old law, which did not admit any witnesses to speak, or any matter to be heard, in favor of her adversary, her Majesty being a party, her Highness' pleasure was that whomsoever could be brought in favor of the subject should be heard.' Mr. Blackstone in his commentaries says that shortly after the revolution of 1688, among the chief alterations of the law, was the "regulation of trials by jury, and the admitting of witnesses for prisoners under oath." Other learned commentators and writers of that period could be cited as showing that the "plea of benefit of clergy," or suspending sentence, was the outgrowth of that condition, when during the trial not only was his mouth closed, but the mouths of all

persons who would testify in his favor were also closed, and this plea, or suspension of sentence, or reprieve as it was called in that day and time, was but a way of permitting those who would testify in his favor to be heard in mitigation of the punishment to be assessed, although in the Common Pleas Court on this hearing they were not allowed to dispute the verdict of guilt which had been found by the jury, but the testimony was received alone to aid the judge in passing sentence after the verdict of guilt, and in mitigation of the punishment. But in the beginning and for a long time this plea was not allowed in cases except where the penalty was death, and was never applied to petit theft or misdemeanors. This can have no application to our jurisprudence for the jury in their verdict fix the punishment as well as pass on the guilt or innocence of an accused person. After it became the law in England that witnesses were permitted to testify on oath in behalf of a defendant on trial of his guilt or innocence, this plea and custom rapidly waned, and by statute it was provided it could not be plead in many cases, and finally in 1827 it was wholly abolished, and has not been the rule in that country since that date. (Bishop's Crim. Law, Sec. 937.) Yet we find some trying to work out a theory whereby our courts would inherit that power from the jurisprudence of England, although it was taken away from the courts of England nearly a century ago, and arose under conditions wholly at variance with our system of jurisprudence.

As has been said by judges of eminent ability, the law of the country whose language we speak and of which we once were a part, is woven into our judicial history, and should be consulted in the construction of our laws, that the laws of England in 1776 became a part and parcel of our common law in so far as applicable to our conditions, and were not inconsistent with our theory and form of government and this is undoubtedly true, but when inconsistent with our system they have no application. In England the King was sovereign and in him all power was supposed to rest, and the history of that country for many years, yea, centuries, teaches that a constant war was waged to wrench from him certain power, by grant of charters and by acts of parliament, guaranteeing to the people certain liberties and certain rights. The power possessed by the courts flowed from the King, and all agencies of government derived their powers from him, and these powers were exercised in accordance with his wish and will and when an exercise of power or authority was sanctioned by him it was deemed to have the approval of the sovereign power. There were no three separate and distinct agencies of government, wholly independent of each other, with their powers and duties defined by the written law of the land as with us. English liberties were the growth of ages, while ours sprung into full bloom with the close of the revolution and the adoption of our Constitution. Then it was that it was recognized and declared that

sovereignty resided in the citizenship of the land, and they had the right, authority and power to create the different agencies of government and delegate to them such powers as they desired them to exercise. Following the Constitution of the United States, Texas, when it placed the "Lone Star" in the galaxy of stars that form this Union, declared that: "The powers of the government shall be divided into three distinct departments, and each of them be confided to a separate body of magistracy, to wit: those which are legislative, to one, those which are executive to another, and those which are judicial to another, and no person, or collection of persons, being of one of these departments, shall exercise any power, properly attached to either of the others, except in the instances herein expressly permitted."

In the organic law at that time it was also declared: "In all criminal cases, except those of treason and impeachment, he (the Governor) shall have power, after conviction, to grant reprieves and pardons," etc. And although the Constitution was rewritten in 1861, 1866, 1869 and 1876, with many amendments and modifications adopted at other periods, these two provisions have remained unchanged, except a change in the latter provision giving to the Governor also "the power to commute punishment," and requiring him to file in the office of Secretary of State his reasons for so doing.

Now what was the power exercised by the English courts under the plea of "Benefit of Clergy?" It was, after the defendant had been adjudged guilty of the offense with which he was charged, for the court to grant a respite, which was termed a reprieve, and not pronounce sentence until it should be determined from the evidence then to be offered on behalf of the defendant whether the penalty of death should be pronounced or whether a less penalty should be assessed, which is nothing more nor less than exercising the "power to commute the punishment," and the sovereigns of this State desiring to make it certain that no one except the Governor should ever exercise this power, apparently being afraid that as first written the power to "reprieve" might not be ample to stay the hands of the other departments of government, later added in their written Constitution that the power to commute the punishment was vested solely in the Governor, clearly making it known that it was not their wish or will that the judiciary shoud ever exercise the power and authority exercised by the English courts under the "Benefit of Clergy" plea. And whatever may be said of the power of the judiciary in this respect in other jurisdictions where the judges assess the punishment and, under a different constitution from ours, the people of Texas in their Constitution took away this power from the judiciary of this State, if it otherwise would have been inherited from the English common law. Whatever may be said about the difference of meaning of "suspension" and "reprieve" in this day and time, the power exercised by the English courts under the clergical

plea was termed a "reprieve" and so known in law, and it is so termed by Mr. Blackstone in his commentaries, by Chitty in his Criminal Law, by Lord Coke, Sir Matthew Hale, and the others familiar with the common law, and while in the statute the word "suspension" may be used, yet if the term is given the same office and effect in law as the word "reprieve" had in the common law, if we seek to justify the power by reference to the common law, then what it purports to do would govern the meaning, and thus it implied the same as reprieve, when that word was placed in the Constitution of the United States and the Constitution of Texas. Mr. Blackstone in his Commentaries (page 375, Book 4) treats of staying judgment after verdict, and says that a defendant may move in arrest of judgment on account of defective indictment, may plead a pardon in arrest of judgment and by praying the benefit of clergy, and "if all these resources fail the court must pronounce the judgment which the law hath annexed to the crime," and his whole work teaches that this power of respite, suspension or reprieve exercised by the court arose from the plea of benefit of clergy alone.

Another difference we would call attention to. Under the common law, and later under the English statute law, there was first tried the guilt or innocence of a person charged with crime, and the trial judge later fixed the penalty, and it was in the sentence pronounced by the judge alone the punishment to be assessed was announced and fixed. In our Federal practice this rule is still followed. In the Federal courts a jury is empaneled, and the guilt or innocence of a prisoner is adjudged by them, they having nothing to say as to the punishment to be undergone for the crime. Our Federal judiciary however is bound down by fixed minimum and maximum punishments that the judge can assess, and this he does in accordance with the circumstances attendant upon the commission of the offense, while under the common law the judge in assessing the penalty was bound within no limits except such as had been established by precedents. Our judges, under the system of jurisprudence in force in this State, have no such power or authority as is exercised by the Federal judges, much less that originally exercised by the judges under the common law in England. With us the jury in passing on the guilt or innocence also assess the punishment to be undergone for such offense, if the prisoner is adjudged guilty, and our judges in pronouncing sentence can neither alter nor amend, increase nor diminish the punishment, but must assess the penalty as fixed by the jury. So the judgment or sentence under the law in our system has not the office of a judgment or sentence under the common law, nor even that of a Federal Court sentence, as in our first Code it was provided: "They (the jury) in their verdict *shall assess* the punishment in all cases where the same is not absolutely fixed by law to some particular penalty." (Art. 626, Willie's Texas Code, 1856.) And in this Code it was also provided that

the judge in passing sentence could only assess the punishment as fixed by the jury and this is now and has always been the law since Texas became a State. So it is seen that the plea of "benefit of clergy," or the rules appertaining thereto, has never had any place in our system of jurisprudence, for in the procedure adopted at the same time it was provided that it is only when the Code fails to provide a rule of procedure shall the rules of the common law govern, and not then when inconsistent with the general principles on which the Code of Procedure was founded. (Art. 27, Willie's Code of Proc.) As to why the authors of the Constitutions of 1836 and 1845, and the members of the Legislature of that period so provided, especially in regard to this plea of clergy, is perhaps best stated by some of the English law writers, who say that while this plea in its incipiency served a useful and humane purpose, especially so when at that time a defendant was not permitted to offer any witnesses on his trial to prove his innocence or in mitigation of the punishment, however, it finally was productive of perjury, bribery, corruption and other attendant evils, and for this and some other reasons perhaps equally as potent the plea was finally abolished in that country where it had its origin, and in our country Mr. Bishop says, in his Criminal Law, has been abolished in nearly all the states except North Carolina and some few other states. (Sec. 938.)

As to the wisdom of the framers of our organic law in giving to one department of government the authority to try offenses and assess the punishment therefor, and to another department the authority to remit the punishment, perhaps, is not for us to judge or discuss, but only to decide whether or not this has been done. Yet a careful and thoughtful student of judicial history is bound to recognize that there were many good reasons therefor, and it relieves the judiciary of much importunity, charges of favoritism, if not more serious charges.

Another ground equally untenable as the one that the court has the inherent authority by what is termed suspension of sentence to relieve a person legally convicted of crime of the punishment fixed by law, is that the words "after conviction" mean after the sentence has been pronounced, and that the Governor has no right to pardon until the court has pronounced sentence. As authority for this contention, we are cited to the case of Arcia v. State, 26 Texas Crim. App., 193, and the cases since that time following that decision. Now what is it the court holds in the Arcia case? That the question may be clearly presented we copy from that opinion:

"But the question here presented is, had the witness, at the time he was offered as such, been convicted of felony, within the meaning of our code, sentence not then having been pronounced against him. In the absence of any statutory provisions affecting this question, we would hold, in accordance with what seems to be the well

settled rule, that a verdict followed by a judgment, renders the conviction complete, and the disqualification at once attaches, but in no case attaches until judgment has been rendered upon the verdict. (Desty's Am. Cr. Law, 49b, note 11; 1 Whart. Ev., sec. 398, note 6.)

"There are, however, some peculiar provisions in our code, which, we think, require more than a verdict and judgment to be shown, in order to establish a forfeiture of civil rights. Under our code, in all felony cases, a sentence must follow the judgment. This sentence is distinct from, and independent of, the judgment, and is, in fact, the final judgment in the · cause. It must be pronounced and entered in all felony cases, except in a capital case, when the death penalty is assessed, before an appeal can be prosecuted. (Code Crim. Proc., arts. 791, .792, 793.) It is the sentence, therefore, and not the judgment, which, under our code, concludes the prosecution in the trial court, and until it has been pronounced it can not be said that the conviction· in the trial court is complete, so as to *work a forfeiture of civil rights."* And it might .be added that if a man appeals, the sentence does not forfeit his civil rights, but the judgment of affirmance by this court. ·

Thus it is seen that the court was not discussing the meaning of the words "after conviction" as used in the Constitution of 1845, and in all our Constitutions since that date, nor when the power of the Governor to pardon attached. In that case Judge Willson limits the decision as it *affects the civil rights* of the person adjudged guilty of crime and bases it upon the peculiar wording of our statutes, and the fact that sentence must now be pronounced before the right of appeal accrues, not only intimating but stating plainly that he would have otherwise held but for these peculiar provisions of the code. When the Constitution with this clause to pardon, to reprieve was adopted, the law did not require, in fact did not permit sentence to be pronounced until after appeal and the judgment of the Appellate Court had been rendered. The Code of 1856 provided, article 629: "In every case of conviction for a felony, no judgment shall be entered on the verdict until the expiration of the time allowed for making a motion for a new trial, or in arrest of judgment." Article 683: "In cases of felony, where an appeal is taken, sentence shall not be pronounced, but shall be suspended until the decision of the Supreme Court has been rendered." Article 688: "The only reasons which can be shown on account of which sentence can not be passed, are: 1. That the defendant has received a pardon from the proper authority. 2. That the defendant is insane." Thus it is seen that shortly after the adoption of the Constitution of 1845, which authorized the Governor to pardon after conviction, our Code did not contain the "peculiar provisions" referred to by .the court in 1888 when the opinion in the Arcia case was rendered, but the provisions of the Code then followed the procedure then

generally recognized of not permitting sentence to be pronounced until after the Appellate Court had passed on the case, and our Legislature, of contemporaneous time, gave the words a meaning, not embracing the sentence, for it specifically provided that when called on to state why sentence should not be pronounced, if the defendant presented a pardon from the proper authority no sentence could ever be pronounced, thus recognizing that these words in the Constitution did not mean *after sentence* as is now contended by appellant. And the meaning of the words at the time they were placed in the Constitution could not be altered nor amended by any legislation at a subsequent time, as has been frequently decided by this court. (Keller v. State, 87 S. W. Rep., 675, and authorities there cited. This contemporaneous legislative construction of the meaning of the words "after conviction" is in accord with the meaning of the words as known to the common law, and as adhered to by the great weight of authority in this country, and is in accord with the opinion of this court in the Arcia case, supra. Under the common law a person was said to be *convicted of the crime* when verdict was rendered thereon adjudging him guilty, but not *attained* (a forfeiture of civil rights) until after the punishment had been assessed by the judgment and sentence of the court. Blackstone says:

"If the jury find him (the prisoner) guilty, he is then said to be convicted of the crime whereof he stands indicted; which conviction may occur two ways: either by his confessing the offense and pleading guilty, or by his being found so by the verdict of his country." (4 Black. Com. 262.) The same author says: "The plea of autrefois acquit, or a former conviction for the same identical crime, though no judgment was ever given or perhaps will be (being suspended by the benefit of clergy or other causes), is a good plea in bar to an indictment." (4 Black. Com. 336.) In 1 Inst. 391, it is said: "The difference between a man attainted and convicted is, that a man is said convict before he hath judgment; as, if a man be convict by confession, verdict or recreancie, and when he hath his judgment upon the verdict, he is said to be attaint." And further it is said by the same writer: "So as by conviction of a felon, his goods and chattels are forfeited; but by attainder, that is, by judgment given, his lands and tenements are forfeited and his blood corrupted, and not before." In Jacob's Law Dictionary, 163, it is said: "There is a great difference between a man convicted and attainted, though they are frequently, though inaccurately, confounded together;" and in the same work it is said: "Convict, convictus— he that is found guilty of an offense by verdict of a jury. Crompton saith that conviction is either when a man is outlawed, or appeareth and confesseth, or is found guilty by the inquest; and when a statute excludes from clergy persons found guilty of felony, etc., it extends to those who are convicted by confessions. (2 Cromp. Just. 9.)" "Judgment amounts to conviction, though it doth not follow that

every one who is convicted is adjudged." (2 Cromp. Just. 63, tit. Convict and Conviction.) Bishop says: "The word 'conviction' ordinarily signifies the finding of the jury, by verdict, that the prisoner is guilty. When it is said there has been a conviction, the meaning usually is, not that sentence has been pronounced, but only that the verdict has been returned. So a plea of guilty by the defendant constitutes a conviction of him." The same author says: "A conviction, in ordinary legal language, constitutes a plea or verdict of guilty, and it is immaterial whether or not final judgment has been rendered thereon." (2 Bish. Cr. Law, sec. 903; 1 Bish. Cr. Law, sec. 963.) See also, on this point, People v. March, 6 Cal., 543; People v. Goldstein, 32 Cal. 433; Blair's Case, 25 Gratt., 850; Commonwealth v. Williamson, 2 Va. Cas., 211; Shepherd v. People, 24 How. Pr., 38; Commonwealth v. Lockwood, 109 Mass., 323; State v. Alexander, 76 N. C., 231; Commonwealth v. Richards, 17 Pick., 295; Nason v. Staples, 48 Me., 125; United States v. Gilbert, 2 Sum., 40; 2 Hawk. P. C., 36, secs. 1, 10; United States v. Watkinds, 6 Fed. Rep., 152; Bouvier's Law Dict., verb. Conviction.

The foregoing references show that the ordinary meaning of the word "conviction" is the verdict of guilty pronounced by a jury. As said by Read, J., speaking for the court in State v. Alexander, supra: "The word is ordinarily used to denote the verdict of the jury, guilty. How did the jury find? Guilty; or they convicted him. What did the judge do? Sentence him to be hanged. This is the language ordinarily used in such matters, both in conversation and in books, law and literary. It is never said that the jury sentenced him nor that the judge convicted him." (76 N. C., 231.)

And in Shepherd v. The People, 24 How. Pr., 401, we find the following excerpt quoted approvingly:

"In 1st Inst., 391, a., it is said: 'The difference between a man attainted and convicted, is, that a man is said convict before he hath judgment, as if a man be convict by confession, verdict or recusance; and when he hath his judgment upon the verdict he is said to be attaint.' It is further said: 'By a conviction of a felon, his goods and chattels are forfeited; but by attainder, that is, by judgment given, his lands and tenements are forfeited, and his blood corrupted, and not before.' So in Jacob's Law Dict. (Attained), it is said: 'Attainder of a criminal is larger than conviction; a man is convicted when he is found guilty or confesses the crimes before judgment had, but not attainted till judgment is passed upon him.' This shows the technical common law definition of the word convict or convicted; a felon was convicted by the verdict of a jury, he was attainted by the judgment rendered on the verdict."

In the 9th Vol. of Cyc., page 865, the general definition of the word "conviction" is given as: "The finding of a person guilty by a verdict of a jury; that legal proceeding of record which ascertains the guilt of the party, and upon which the sentence and judgment

is founded," and the following authorities are cited: Fanning v. State, 47 Ark., 442, 443, 2 S. W., 70 (quoting Bishop Cr. L. sec. 223); People v. Rodrigo, 69 Cal., 601, 605, 11 Pac., 481 (quoting Bishop Crim. L., sec. 223); Ex parte Brown, 68 Cal., 176, 179, 8 Pac., 829 (citing Bishop Cr. L., sec. 903); Bishop State Cr., sec. 348; Jacob L. Dict.; Quintard v. Knoedler, 53 Conn., 485, 487, 2 Atl., 752, 55 Am. Rep., 149 (quoting Bishop Stat. Cr., sec. 348); State v. Barnes, 24 Fla. 153, 4 So., 560; State v. Moise, 48 La. Ann., 109, 122, 18 So. 943, 35 L. R. A. 701 (quoting State v. Wilson, 14 La. Ann., 446, 448 (citing 1 Chitty Cr. L., 601, 648, 653); Bishop. Stat. Cr., sec. 348), where it is said: "The word 'conviction,' which occurs in Article 66 of the Constitution, signifies that the defendant's guilt has been ascertained by the verdict of the jury, and not that the sentence of the law has been pronounced by the court."

Francis v. Weaver, 76 Md., 457, 467, 25 Atl., 413; Com. v. Gorham, 99 Mass., 420, 422 (quoted in Com. v. Kiley, 150 Mass., 225, 226, 23 N. E. 55; Com. v. Lockwood, 109 Mass., 323, 330, 12 Am. Rep., 699). Blaufus v. People, 69 N. Y., 107, 109, 25 Am. Rep., 148; Schiffer v. Pruden, 64 N. Y., 47, 52; Messner v. People, 45 N. Y., 1, 12 (citing 4 Bl. Comm., 362; Bouvier L. Dict.); State v. Alexander, 76 N. C., 231, 232, 22 Am. Rep., 675 (quoted in Ex parte Brown, 68 Cal., 176, 180, 8 Pac., 829).

Wilmoth v. Hensel, 151 Pa. St., 200, 25 Atl., 86, 91, 31 Am. St. Rep., 738 (citing Smith v. Com., 14 Serg. & R. (Pa.), 69); White v. Com., 79 Va., 611, 615 (quoting 1 Bishop Cr. L., sec. 348); Hartley v. Henretta, 35 W. Va., 222, 227, 13 S. E. 375 (quoting Bouvier L. Dict.); United States v. Watkinds, 6 Fed. 152, 158, 7 Sawy. 85 (quoting Bishop Stat. Cr., sec. 348).

Bouvier L. Dict. (quoted in Fanning v. State, 47 Ark., 442, 443, 2 S. W., 70; People v. Rodrigo, 69 Cal., 601, 605, 11 Pac., 481; Hartley v. Henretta, 35 W. Va., 222, 13 S. E. 375). See also White v. Com., 79 Va., 611, 615, where it is said, referring to this definition: "The first of the definitions here given undoubtedly represents the accurate meaning of the term, and includes an ascertainment of the guilt of the party by an authorized magistrate in a summary way, or by confession of the party himself, as well as by verdict of a jury."

Com. v. Richards, 17 Pick. (Mass.), 295, 296 (quoted in Com. v. Lockwood, 109 Mass., 323, 328, 12 Am. Rep., 699): "Conviction may accrue in two ways, either by his (defendant's) confessing the offense and pleading guilty, or by his being found so by the verdict of his country." 4 Bl. Comm., 362 (quoted in Healey v. Martin, 33 Misc. (N. Y.), 243, 248, 68 N. Y. Suppl., 413; Burgess v. Boetfeur, 8 Jur., 621, 12 L. J. M. C., 122, 7 M. & G., 481, 8 Scott N. R., 194, 49 E. C. L., 481). Conviction is on confession or verdict. 6 Dane Abr., 534, 536 (quoted in Com. v. Lockwood, 109 Mass. 323, 328, 12 Am. St. Rep., 669). Crompton saith that conviction is either when

a man is outlawed, or appeareth and confesseth, or is found guilty by the inquest; and when a statute excludes from clergy persons found guilty of felony, etc., it extends to those who are convicted by confession. 2 Crompton Just., 9 (quoted in Ex parte Brown, 68 Cal., 176, 179, 8 Pac. 829; Blair v. Com., 25 Gratt. (Va.), 850. So a plea of guilty by defendant constitutes a conviction of him. Ex parte Brown, 68 Cal., 176, 8 Pac. 829 (quoting Jacob L. Dict.); Bishop Stat. Cr., sec. 348 (quoted in Quintard v. Knoedler, 53 Conn., 485, 487, 2 Atl., 752, 55 Am. Rep., 149). Compare Blair v. Com., 25 Gratt. (Va.), 850, 853.

Distinguished from "judgment" or "sentence." "The ordinary legal meaning of 'conviction' when used to designate a particular stage of a criminal prosecution triable by a jury, is the confession of the accused in open court, or 'the verdict' returned against him by the jury, which ascertains and publishes the fact of his guilt; while 'judgment' or 'sentence' is the appropriate word to denote the action of the court before which the trial is had, declaring the consequences to the convict of the fact thus ascertained.' Com. v. Lockwood, 109 Mass. 323, 325, 12 Am. Rep. 699 (cited or quoted in Quintard v. Knoedler, 53 Conn. 485, 487, 2 Atl. 752, 55 Am. Rep. 149; State v. Barnes, 24 Fla. 153, 4 So. 560; State v. Moise, 48 La. Ann. 109, 121, 18 So. 943, 35 L. R. A. 701; People v. Adam, 95 Mich. 541, 543, 55 N. W. 461; People v. Lyman, 33 Misc. (N. Y.) 243, 248, 63 N. Y. Sup. 331; State v. Alexander, 76 N. C. 231, 232, 22 Am. Rep. 675; Com. v. Miller, 6 Pa. Super. Ct. 35, 40; In re Freidrich, 51 Fed. 747, 749). See also Hackett v. Freeman, 103 Iowa, 296, 299, 72 N. W. 528 (citing Schiffer v. Pruden, 64 N. Y. 47, 52; Blair v. Com., 25 Gratt. (Va.) 850; Bishop Cr. L., sec. 361; McClain Cr. L., sec. 110.

Many other authorities might be cited giving the meaning of the word as defined above, and to give it a larger or more comprehensive meaning, authority must be found in the statutes of the State, and in the statutes of our State instead of there being authority found to give to the words "after conviction" a more comprehensive meaning than was known at the common law, or their common signification at the time they were placed in the Constitution, we find express statutory authority to the contrary, giving to the words the common law meaning, by expressly declaring that at the time of sentence, that in bar of sentence, if he produce a pardon from the proper authority, no sentence should be pronounced but he should be discharged. See article 688, Penal Code of 1856, and which provision and construction has been brought forward in every codification since that date, and it is now article 861 of the Revised Code of Procedure of 1911.

Thus it is seen that the terms "after conviction" in our Constitution do not embrace the sentence but simply mean the determination of guilt by the tribunal authorized to try the issue of guilt or inno-

Vol. LXVII Crim.—41.

cence of a defendant, and the person becomes subject to pardon when-
ever that issue is finally determined. The question of right of appeal
can not be properly considered in the case, for our Constitution gives
to no one the absolute right of appeal, but only gives the right under
such regulations and restrictions as the Legislature may prescribe.
(Section 5, article 5. of Constitution.) The Legislature in this bill
has provided if a person shall apply- and the sentence is suspended,
no right of appeal shall exist. So the guilt of the person is finally
determined by the tribunal authorized by law to try that issue, the
punishment is fixed by the verdict and judgment thereon, and this
within the contemplation of our Constitution and laws is a convic-
tion of the offense charged in the indictment, and a *final conviction,*
for no other or additional step is authorized to be taken by any
tribunal in determining the guilt or innocence of the accused.

Appellant failed in his brief to draw the distinction between the
legal meaning of the words "conviction" and "attainder," and for
this reason has fallen into the error he did. Under the common law
a man did not forfeit his civil rights until after he had been at-
tainted, and this followed the sentence, whereas he was convicted of
the offense by verdict of the jury, that is, by the determination of his
guilt or innocence by the tribunal authorized to sit in judgment on
that issue. In the Arcia case, supra, this court limited its holding
to a *forfeiture of civil rights,* and specifically so stated in the opin-
ion, and has so held in all subsequent opinions, and the decisions
cited are not in conflict with this opinion in this case, when the par-
ticular provision of the Act of the Thirty-Second Legislature, the
one under consideration, is considered, for the Legislature by that
Act has taken from a defendant the right of appeal if the court
suspends sentence under its provisions, and the "conviction" becomes
a finality, and the Act proceeds on the theory that a chance will be
given him for reformation, and release him from punishment for a
crime he has committed as an incentive to reform.

And while counsel in their brief take issue with us wherein we
stated, that by the provisions of the Act, the court was not only au-
thorized to remit all punishment, but *restore him to all his privileges,*
we do not deem it necessary to discuss this at length. It is true that
in the Arcia case it was held that a defendant's civil rights were not
forfeited until sentence was pronounced and this court had acted on
the appeal, if appeal was not waived, but by this Act of the Legis-
lature the right of appeal was taken away, and it is contemplated
that *no sentence will ever be pronounced,* although the guilt of the
accused has been finally determined and his punishment assessed. Had
our laws not provided for sentence and an appeal to this court, the
holding of Judge Willson would have been wholly different, as is
demonstrated by the opinion itself, and would have been in accord
with the rule at common law, which was that if a person was ad-
judged guilty of an offense, and he prayed and was allowed the benefit

of clergy, if no sentence was ever pronounced, yet such convicted person would not be competent as a witness, as is stated in both Blackstone's Commentaries and Chitty's Criminal Law. And no one would question, if under this Act a person had been tried and convicted, his sentence suspended, if it should be attempted to try him again for the same offense, a plea of *autrefois convict* would be sustained by any court in the land, for it would be evidence that he had been tried and convicted of the same offense.

Counsel in their motion and brief admit that if the Act "does attempt to confer pardoning power on the judge, then no intelligent lawyer would deny its unconstitutionality." We will then consider the object, purpose and effect of the Act. It provides that when there is a *conviction* for any felony (except certain enumerated felonies) and the punishment assessed by the jury is not more than five years, the court shall enter its judgment so finding, but if the jury also finds that the defendant has never before been convicted of any felony, upon application of the defendant the court shall hear testimony, and if in his opinion the defendant has never before been convicted of a felony, and is a proper subject for clemency (this being a matter left entirely within the discretion of the judge) the court may decline to pronounce sentence, and release the defendant on his own recognizance. It further provides though if at any time, within the time prescribed by the Act, the defendant shall again be convicted of a felony, or a misdemeanor involving moral turpitude, the court shall then proceed to sentence the defendant upon the original judgment of conviction. Thus it is seen that this Act is drawn in accordance with the practice of the English courts under the "benefit of clergy" plea as known in the eighteenth century (just before its abolishment in that country), except there is added to the provisions the right to later recall the judgment of clemency and inflict the original punishment for some act thereafter committed. This was never known, or practiced at common law, and as said by the North Carolina court, "We search in vain for authority in the text-books of the law for a precedent for the court to pronounce judgment on the then conditions as they exist, and if subsequently after the term conditions alter, to withdraw the judgment then entered and pronounce an entirely different judgment." But as before stated, the common law plea of benefit of clergy never became a part of the jurisprudence of this State, and unless the sovereign will shall change the provisions of our Constitution, it never can be engrafted thereon. But a *conditional pardon* was known to the common law and in practice in England at the date of our independence, but it could be granted by the King alone. Mr. Chitty in his Criminal Law (p. 773) says that his Majesty could grant a pardon upon any condition, and if the beneficiary does not perform the condition or conditions, it will be void, and he may be brought back and made to suffer the original penalty.

Mr. Blackstone (iv. p. 401) says a pardon may also be conditional, that is the King may extend his mercy upon what terms he pleases, and may annex to his bounty a condition either subsequent or precedent, on the performance whereof the validity of the pardon will depend, and this by the common law. See also 1 Bail 283; 1 McCord, 176; 1 Park Cr. Cas. 47; 1 Bishop Cr. L. 914; Ex parte Wells, 18 Howard (U. S. 730); Carr v. State, 19 Texas Crim. App. 635. Other learned authors treating of the common law could be quoted and cited, but we deem these sufficient to show that in this statute has been woven all the elements of a conditional pardon as known at the common law, and all the elements of a conditional pardon as practiced in this State from its organization and now in actual practice. This character of "suspension of sentence" or reprieve was never exercised by the common law courts, and is and was unknown to the English jurisprudence, and the jurisprudence of this country, and to term it a "suspension of sentence" is a misnomer and giving those words a meaning unknown to the law and unauthorized by any lexicographer. At the time when the common law of England was adopted as a part of the jurisprudence of the United States, the law relating to the pardoning power of the crown was well established; the meaning of the terms, "pardon," "reprieve," and the like were thoroughly understood, and the rules governing the nature and extent of the pardoning power, the construction of pardons and their effect, were well settled. The pardoning power as conferred by the Constitution of the United States and the constitutions of the various States is in its essential elements the same as the pardoning power which for centuries has been exercised by the King of England, and which prior to the revolution was exercised in those parts of this country which were British colonies. When, therefore, it becomes necessary to construe and interpret any constitutional grant of the pardoning power, the established principles of the common law of England, and the meaning of legal terms as understood and used in the jurisprudence of that country, furnish a basis for the decisions of both the state and the federal courts throughout the United States.

What is a pardon? That term has been defined and has a well understood meaning. In Carr v. State, supra, this court held: "A pardon is a remission of guilt." (1 Bish. Cr. Law, section 898.) It is full, partial or conditional. Full, when it freely and unconditionally absolves the party from all the legal consequences of his crime and of his conviction, direct and collateral; including the punishment, whether of imprisonment, pecuniary penalty, or whatever else the law has provided. (1 Bish. Cr. Law, section 916.) Partial, where it remits only a portion of the punishment, or absolves from only a portion of the legal consequences of the crime. Conditional, where it does not become operative until the grantee has performed some specified act, or where it becomes void when some specified event transpires. (1 Bish. Cr. Law, sec. 914.) In the

case under consideration the pardon is clearly of this latter class. Its validity is made dependent upon the condition subsequent, that the grantee shall not violate any of the criminal laws of this State." This definition is in accordance with the decisions of all the courts of last resort not only in this country, but of England as well. In 7 Bacon Abi., Title Pardons, it is said: "An act of grace which exempts the individual on whom it is bestowed from the punishment the law inflicts for a crime he has committed."

Could the meaning of the Act of the Thirty-Second Legislature be more clearly expressed and what does this Act of. the Legislature attempt or propose to do but exempt a man from the punishment assessed against him for a crime he has committed, upon the sole ground that he go and sin no more? It has no other object, purpose or effect, and by giving it a different name or designation does not change its legal meaning or effect, and the technical hair splitting attempted in an effort to sustain the law does credit to the ingenuity of counsel, but such fine spun distinctions to evade the highest law of any land (its Constitution) can not be given countenance in any court, else the safeguards thrown around our citizenship by the Constitution, protecting them in their life, liberty and property, could be construed out of existence by a judiciary grasping after authority and power, as said by Mr. Cooley. A long list of authorities will be found collated on pages 1559 and 1560, 29 Vol. of Cyc., and a long list of Texas cases will be found in Buckley's Criminal Digest, beginning on page 1229, relating to pardons, etc., and the meaning of the word.

Thus it is seen that the object and purpose of the Act in question, and the sole object and purpose, is to grant to a defendant adjudged guilty of crime, and his punishment assessed, immunity from the punishment on condition that he will not violate any law of the land for a given period of time, and is nothing more nor less and performs the office of a conditional pardon, to become absolute upon compliance with the conditions. This, in the language of appellant's counsel, we think no intelligent lawyer would deny, and if so, it necessarily follows the Act is unconstitutional.

That portion of appellant's brief relating to the power of a court to grant a new trial need not be discussed, because the Act in question does not contemplate another trial of the defendant for the offense, but if he complies with the conditions upon which he is released, the Act contemplates and requires the court to discharge him, regardless of the fact that his guilt has been established in a court of competent jurisdiction beyond question. But we will say that the rule of law is, where no motion for new trial has been filed, after the end of the term at which the judgment was entered, no court has the power or authority to grant a new trial or change its judgment at a subsequent term. Mr. Chitty says: "The judge's judicial authority terminates at the conclusion of the session. . . .

It is clear the court may vacate the judgment during the session, because it is regarded as one day, but they can not do it at any subsequent period, unless adjournment be entered on the roll, that is, an order entered continuing the motion." (Crim. Law, 721.)

Freeman on Judgments, Sec. 69, lays down the rule: "During the term wherein a judicial act is done, the record remaineth in the breast of the judges of the court, and in their remembrance, and therefore the roll is alterable during the term, as the judges shall direct, but when the term is past, then the record is in the roll and admitteth no alteration, averment or proof to the contrarie. (Co. Litt., 260; 3 Black. Comm., 407.) Of the law thus laid down the only part remaining unshaken is that during the term the proceedings remains in the breast of the judges. Not only the records during that term are subject to revision of the court, but the judgment itself may be altered, revised or revoked, as well as amended in respect to clerical errors and matters of form. As a general rule, the judgment can not be amended after the term at which it was rendered. The law does not authorize the correction of judicial errors under the pretense of correcting clerical errors. To entitle a party to amend a judgment or decree, he must establish that the entry as made does not conform to what the court intended it should be when it was ordered." However, the rule in Texas is statutory. Article 2025 Revised Statutes, reads: "All motions for new trial, in arrest of judgment, or to set aside a judgment, shall be determined at the term at which said motion is made." And Article 2023 provides, that the motion must be made during the term at which the judgment was rendered. It is useless to discuss the decisions of those states where the statute authorizes a motion to be filed and heard at a later term, for no one doubts the authority of the Legislature to so provide. In the absence of all legislation, a judgment becomes final when the term is ended, and especially is this true in Texas for the law so provides.

The other questions raised in appellant's brief relate to matters discussed in the companion case to this, decided by Presiding Judge Davidson, and we will not discuss them, but leave them to be treated by him.

But there is another section of our Constitution appellant seems to have wholly overlooked. Section 2 of Article 16 commands the Legislature to enact certain laws in the following language: "Laws shall be made to exclude from office, serving on juries, and from the right of suffrage, those who may have been or may hereafter be convicted of bribery, perjury, forgery, or other high crimes." The Legislature in obedience to this command has passed laws in accordance with its provisions, but this Act of the Legislature, although a person had been adjudged guilty of forgery or bribery, if appellant's construction is correct, and they suffer no disability by reason of such conviction, would be in direct conflict with this provision of the

Constitution, and would therefore be void. There are other provisions of the Constitution that the Act in question is violative of, but the opinion has already been drawn out to such great length that we do not deem it necessary to discuss them, as the Act in question is clearly in contravention of the provision granting to the Governor alone the power and authority to remit the punishment for crime when a person has been legally adjudged guilty and his punishment assessed, and also section 2 of article 16, wherein it is provided that men adjudged guilty of certain offenses shall forfeit certain rights and privileges.

At the risk of again being criticised for stating that we sympathize with the purpose of the law to give first offenders a chance to reform, yet we say we heartily approve legislation with that object in view, but the terms and provisions of such legislation must be in accordance with the provisions of our Constitution. A law can be drawn where if on the trial it appears that it is the first offense, and the evidence convinces the judge that the best interests of society, of the individual, and of the State would be served if the hands of the law were stayed, and the person adjudged guilty be given a chance to reform, to recommend to the Governor a conditional pardon, and we are sure that in every deserving case the recommendation would be complied with by the Governor. The people had the confidence in the Governor to place this power in his hands, and we too have the same confidence. The law could require that he have the court stenographer make a copy of the testimony heard, and require the judge to forward it to the Governor, with his recommendation, and provide that the prisoner be not conveyed to the penitentiary until the Governor had acted on the recommendation. Thus the end sought may be reached in a way not violative of our Constitution, and all the good features in the law be retained. But while we sympathize with the purposes of the law, and think its provisions, if they could be carried out, might and probably would be productive of much good, yet the people of this State wrote and adopted their Constitution, granting their power to whom they deemed proper, and if it is altered or changed in any provision, it must be done by them, and not be frittered away by technical judicial construction, and so long as we shall remain on the bench, no matter how our sympathies may be, and no matter who may seek to exercise authority not given them, we shall take the Constitution as our guide and uphold it in all its provisions, for it is the supreme law of the land. In doing so, we are simply doing our duty, and we will not countenance usurpation of authority by the judiciary any more than we will in any other department of government.

The motion for rehearing is overruled.

*Overruled.*

DAVIDSON, Presiding Judge.—Agreeing to the conclusion reached, I deem it not necessary to write further than I have heretofore done in the companion case.

PRENDERGAST, Judge.—When the original opinion herein, and in the companion case were delivered, declaring the Act quoted in the original opinion unconstitutional, I had so much doubt, and expressed it, I was then unwilling to concur in those opinions on that question. Since then upon a more thorough investigation and consideration of the question, I am convinced that said Act is unconstitutional, and I therefore concur in the opinions on that question.

The object and purpose of the Act is so commendable I regret exceedingly the Constitution, as it now is, prevents its being enforced. Perhaps in the wisdom of the Legislature some constitutional way will be devised to accomplish the desired purpose. If not, then the people if they desire, can so amend our Constitution as to clearly authorize it.