# IN THE MATTER OF THE PETITION OF MARTHA A. HART FOR A WRIT OF HABEAS CORPUS.

(L.R.A.——, 149 N. W. 568.)

**Commutations and pardons — board of pardons — exclusive power vested in.**

1. The exclusive power to grant commutations and pardons is vested by article 3 of the Amendments to the Constitution of North Dakota in the board of pardons.

**Trial court may suspend execution of sentence — appeal to executive clemency.**

2. A trial court may, without encroaching upon the prerogatives of the pardoning power, suspend the execution of sentence so as to allow an opportunity for an appeal to executive clemency.

**Suspension of sentence — may be revoked — sentence later pronounced.**

3. Where the court suspends a jail sentence for an indefinite period, under the provisions of chapter 136 of the Laws of 1913, such suspension may be

---

Note.—This case is in harmony with the other authorities on the subject, as shown by a review of the cases in notes in 33 L.R.A. (N.S.) 112, and 39 L.R.A. (N.S.) 242, in sustaining the power of the court to enforce a sentence after a stay of execution.

revoked and the defendant imprisoned even after the period of the sentence has expired.

Opinion filed November 21, 1914.

Original petition for a writ of habeas corpus. Writ issued
Writ quashed.

Statements of facts by BRUCE, J.

This is a proceeding upon a writ of habeas corpus, the writ having been issued by this court. On the 20th day of October, 1913, the petitioner was arrested at the city of Fargo, and brought before the Honorable A. G. Hanson, judge of the county court of Cass county, on the charge of keeping and maintaining a bawdy house. She entered a plea of guilty, and the court imposed a fine of $300 and a jail sentence of six months, and also required the defendant to pay the costs of the action. On the same day the following order suspending the jail sentence was entered: "Said defendant and her attorney, Seth W. Richardson, Esq., appeared in court, and the state's attorney, A. W. Fowler, was also present. The defendant then in person and in open court withdrew her plea of not guilty to the charge of keeping and maintaining a bawdy house, and entered a plea of guilty to said charge. By consent of counsel, judgment was then entered, and said defendant was sentenced to be confined in the county jail of Cass county, North Dakota, for a period of six months, and pay a fine of $300 and costs of this action taxed at $3.70, and in default of the payment of the fine and costs, that she stand committed to the said county jail for the further period of ninety days. Thereupon said defendant by her counsel paid into court said fine of $300 and $3.70 costs, and, it appearing to the satisfaction of the judge of this court that said defendant has not heretofore been imprisoned for crime, and it further appearing to the satisfaction of the judge of this court that said defendant is about to leave this state, and it further appearing to the satisfaction of the judge of this court that the public welfare does not demand or require that the defendant shall suffer the full penalty of the judgment imposed by said sentence; now therefore, on motion of said state's attorney, it is hereby ordered and directed that said jail sentence of six months imposed upon said defendant as aforesaid be, and the same

hereby is, suspended, and said defendant having paid into the court the fine and costs as required by said judgment and sentence, said defendant is hereby ordered discharged and released from custody forthwith.    Dated at Fargo, N. D. this 28th day of October, 1913.    By the Court, A. G. Hanson, Judge."

After the entering of this order the petitioner seems to have resided outside of the state for the period of six months.    About a year after and on the 2d day of October, 1914, however, she was again charged with keeping a bawdy house in the city of Fargo, and although a plea of not guilty seems to have been entered in the action, and no trial seems to have been yet had thereon, the following order was entered by the court:    "Order vacating order suspending jail part of sentence. The above-entitled action came on this day to be heard upon the application of Arthur W. Fowler, state's attorney, for an order vacating that certain order made in this court on October 28th, 1913, in the above-entitled case, suspending the jail part of the sentence which had been on that day imposed upon the above-named defendant, and the state's attorney having submitted evidence proving that the above-named defendant had on the 2d day of October, 1914, violated the laws of this state by conducting a bawdy house at No. 217, 2d Avenue North, in the city of Fargo, North Dakota, and the court having duly considered the matter, and being fully advised in the premises, and believing that the said order suspending said sentence should be revoked and set aside, now therefore, it is hereby ordered that the said order dated October 28th, 1913, suspending the jail part of the sentence, be, and the same is hereby, revoked and set aside.    Dated at Fargo, N. D. this 2d day of October A. D. 1914.    By the Court, A. G. Hanson, Judge."

A bench warrant was duly issued on this order of suspension, and the petitioner was arrested.    A petition was then made to the district court of Cass county for a writ of habeas corpus, which was issued, but quashed on the hearing.    Petitioner and defendant then applied to this court for a writ, which was issued and a return made, the sheriff justifying under the order of revocation and the bench warrant of the county court.

*Harry Lashkowitz,* for petitioner.

*Wm. C. Fowler,* State's Attorney, and *Wm. C. Green,* Assistant State's Attorney, for the State.

The court had jurisdiction to suspend the execution of the sentence, and, later on, to revoke such suspension and enforce the sentence. Mere matters of form are immaterial. State ex rel. Styles v. Beaverstad, 12 N. D. 531, 97 N. W. 548; State v. Buckley, 75 N. H. 402, 74 Atl. 875; Re Collins, 8 Cal. App. 367, 97 Pac. 188; Weber v. State, 58 Ohio St. 616, 41 L.R.A. 472, 51 N. E. 116; State v. Vaughan, 71 Conn. 457, 42 Atl. 640; Re Hinson, 156 N. C. 250, 36 L.R.A. (N.S.) 352 and cases cited, 72 S. E. 310; Fults v. State, 2 Sneed, 232.

Every court has inherent power to enforce obedience to its mandates, and to do all things within its jurisdiction necessary for the administration of justice. 8 Am. & Eng. Enc. Law, 28, and cases cited; Re Markuson, 5 N. D. 180, 64 N. W. 939; Re Schantz, 26 N. D. 380, 144 N. W. 445; Rev. Codes 1905, § 9513.

The suspension of sentence is not a reprieve. The one postpones the execution of sentence for an indefinite time; the other to a fixed day. Carnal v. People, 1 Park. Crim. Rep. 263; State v. Finch, 54 Or. 482, 103 Pac. 511; Miller's Case, 9 Cow. 730; State v. Abbott, 33 L.R.A.(N.S.) 120, note.

A court in suspending the execution of sentence does not encroach upon the powers of the pardon board. Snodgrass v. State, — Tex Crim. Rep. —, 41 L.R.A.(N.S.) 1144, 150 S. W. 162.

BRUCE, J. (after stating the facts as above). The question to be resolved in this case is whether, after an order suspending a jail sentence on which no commitment has been issued, and six months after the period of that sentence has expired, the court which imposed the sentence and suspended the same may revoke the order, and order the commitment of the defendant, and require her to serve out the original jail sentence.

The statute under which the sentence was suspended is chapter 136 of the Laws of 1913, and reads as follows: "Section 1. Court may suspend or modify sentence, when. In all prosecutions for misdemeanors, where the defendant has been found guilty, and where the court or magistrate has power to sentence such defendant to the county

jail, and it appears that the defendant has never before been imprisoned for crime, either in this state or elsewhere (but detention in an institution for juvenile delinquents shall not be considered imprisonment), and where it shall appear to the satisfaction of the court or magistrate that the character of the defendant and circumstances of the case are such that such defendant is not likely again to engage in an offensive course of conduct, and where it appears that the public welfare does not demand or require that the defendant shall suffer the penalty imposed by the law, said court or magistrate may suspend the execution of the sentence or may modify or alter the sentence imposed in such manner as to the court or magistrate, in view of all the circumstances, seems just and right."

We are of the opinion that the court had jurisdiction to revoke this order. There can be no doubt that the power "to remit fines and forfeitures, to grant *commutations* and *pardons* after convictions, for all offenses except treason and cases of impeachment," was by § 76 (art. 3) of the Constitution vested solely and exclusively in the governor; that § 76, that is to say—article 3 of the Amendments—took this exclusive power from the governor and vested it in the board of pardons, of which the governor is a member, and that the sole and exclusive power in such matters now rests in that board. Re Webb, 89 Wis. 354, 27 L.R.A. 356, 46 Am. St. Rep. 846, 62 N. W. 177, 9 Am. Crim. Rep. 702; Snodgrass v. State, — Tex. Crim. Rep. —, 41 L.R.A.(N.S.) 1144, 150 S. W. 162.. , We realize, of course, that there are some authorities which seem to hold that, prior to the American Revolution, the English courts exercised a co-ordinate power in such matters, and which seem to argue for a like power in the American courts. If the premise were true, it can, on the ground of analogy, have no application in America, as, prior to the English Revolution and the establishment of the so-called parliamentary idea, the theory, though occasionally combatted, was consistently adhered to, that the power which was possessed by the courts flowed from the King, that all agencies of government derived their power from him, and that these powers were exercised in accordance with his wish and will, and that when the exercise of power or authority was sanctioned by him it was deemed to have the approval of the sovereign power. Even after the English Revolution, and the establishment of the parliamentary idea, it has been "the King in Par-

liament" who has governed trials. There are not in England, in fact, and never have been, three distinct agencies of government, wholly independent of each other, with their powers and duties defined by the written law of the land, as is the case in America. See Snodgrass v. State, supra; Jenks, Short History of English Law, p. 187. The act of the judge, therefore, was to a large extent that of the sovereign.

Even if this were not the case, however, the premise is itself entirely false from a historical standpoint. Prior to the American Revolution the English courts never, as a matter of fact, exercised, or presumed to exercise, the powers which are sought to be conferred by the statute in question, and at the time of the English Revolution, in 1688, and, long prior to the American Revolution and to the adoption of the American Constitutions, both state and national, had ceased to exercise the powers on the analogy of which the premise and the argument is based. To quote from the opinion in the case of Snodgrass v. State, supra: "In the early days of England a person upon trial as to his guilt or innocence was not permitted to introduce any witnesses to prove himself innocent of an offense charged against him, nor in mitigation of the punishment. The Crown introduced its evidence to prove his guilt, and, if that testimony showed his guilt to the satisfaction of the jury, they so found. If the court had a doubt of his guilt from the testimony, it could not grant a new trial on that ground, and no appeal was then permitted on this ground. Under this condition the plea of benefit of clergy arose. It was first claimed by officials of the church alone, who claimed the right to be tried in the ecclesiastical court. This plea was then permitted to all persons eligible to clerk or other position in the church,—that is, all men who could write,—and finally broadened to apply to all persons charged with crime. Not being permitted to offer testimony showing his innocence on the trial, nor offer testimony in mitigation of the punishment, after being found guilty by verdict, when granted the benefit of clergy, persons adjudged guilty of crime were first permitted in the ecclesiastical court to expurgate themselves, or prove their innocence and offer evidence in mitigation. Later the courts that tried the cases after verdict but *before assessment of the punishment by sentence,* would permit a defendant to introduce testimony in mitigation of the punishment to be assessed by the sentence or judgment of the court; and under this system there grew up

the custom of suspending the sentence until the evidence was heard under this plea, so that the court might have the benefit of it in arriving at the punishment he would assess.   Upon hearing this testimony the court frequently refused to inflict the death penalty, which was. virtually the penalty for all felonies, and would only assess a penalty of burning in the hand to mark the man; later, burning in the face; and, still later, sentencing the person adjudged guilty, to transportation to America or some other' point beyond the seas, and other penalties. From this power of the courts of England, claimed and exercised in an early day, must we look to any inherent power in a court to ameliorate or relieve any person of punishment adjudged guilty of an offense.   In Chitty's Crim. Law, Vol. 1, p. 624, the rule at that time is said to have been: 'By the common law . . .  the prisoner was not even permitted to call witnesses. . . .  But the jury were to decide on his guilt or innocence according to their judgment upon the evidence offered in support of the prosecution.  And, though . . .  this latter practice of rejecting evidence for the prisoner was abolished about the time of Queen Mary, yet the witnesses could not be sworn on behalf of the prisoner, but were merely examined without any particular obligation, and therefore obtained but little credit with the jury.'   In his work he recites that Queen Mary in appointing Sir Richard Morgan Chief Justice of the common pleas enjoined him 'that notwithstanding the old error [of the old law], which did not admit any witnesses to speak, or any other matter to be heard, in favor of the adversary, her Majesty being a party, her Highness's pleasure was that whosoever could be brought in favor of the subject should be heard.'   Mr Blackstone in his commentaries says that, shortly after the Revolution of 1688, among the chief alterations of the law was the 'regulation of trials by jury, and the admitting of witnesses for prisoners under oath.'   Other learned commentators and writers of that period could be cited as showing that the 'plea of benefit of clergy,' or *suspending sentence,* was the outgrowth of that condition, when during the trial not only was his mouth closed, but the mouths of all persons who would testify in his favor were also closed, and this plea or suspension of sentence, or reprieve, as it was called in that day and time, was but a way of permitting those who would testify in his favor to be heard in mitigation of the punishment to be assessed, although in the common pleas court on this hearing they were

not allowed to dispute the verdict of guilt which had been found by the jury, but the testimony was received alone to aid the judge in passing sentence after the verdict of guilt, and in mitigation of the punishment. But in the beginning and for a long time this plea was not allowed in cases except where the penalty was death, and was never applied to petit theft or misdemeanors. This can have no application to our jurisprudence, for the jury in their verdict fix the punishment, as well as pass upon the guilt or innocence of an accused person. After it became the law in England that witnesses were permitted to testify on oath in behalf of a defendant on trial of his guilt or innocence, this plea and custom rapidly waned, and by statute it was provided it could not be pleaded in many cases; and finally in 1827 it was wholly abolished, and has not been the rule in that country since that date. Bishop, Crim. Law, § 937. Yet we find some trying to work out a theory whereby our courts would inherit that power from the jurisprudence of England, although it was taken away from the courts of England nearly a century ago, and arose under conditions wholly at variance with our system of jurisprudence." See also State v. Voss, 80 Iowa, 467, 8 L.R.A. 767, 45 N. W. 898.

That the order of the trial court suspending sentence in the case at bar would, if construed as petitioner desires it, constitute an invasion of the province of the board of pardons, there can, indeed, be but little question. Ex parte Clendenning, 1 Okla. Crim. Rep. 227, 19 L.R.A. (N.S.) 1041, 97 Pac. 650; Snodgrass v. State, — Tex. Crim. Rep. —, 41 L.R.A.(N.S.) 1144, 150 S. W. 162; Re Webb, 89 Wis. 354, 27 L.R.A. 356, 46 Am. St. Rep. 846, 62 N. W. 177, 9 Am. Crim. Rep. 702; State v. Abbott, 87 S. C. 466, 33 L.R.A.(N.S.) 112, 70 S. E. 6, Ann. Cas. 1912B, 1189. It is to be remembered that the Constitution vests in the board the power both to *commute* and to *pardon*. We have no doubt that, following the analogy of the English courts, and as a power which is inherent in the court itself, and certainly under the sanction of the statute, the trial judge can suspend the enforcement of a sentence for a reasonable time in order to allow an appeal to the executive clemency. Beyond this, however, the courts cannot go. The case at bar, in fact, is none other than one in which the court has, under the sanction of the statute, allowed the defendant that opportunity; and although the time that has elapsed between the rendition of the judg-

ment and the rearrest has been longer than the original sentence, the defendant cannot complain, as the original order was legal, and the failure to sooner seek for the clemency of the board of pardons is due to the delay not of the court, but of the defendant herself. Miller v. Evans, 115 Iowa, 101, 56 L.R.A. 101, 91 Am. St. Rep. 143, 88 N. W. 198; Re Schantz, 26 N. D. 380, 144 N. W. 445; Fuller v. State, — Miss. —, 39 L.R.A. (N.S.) 242, 57 So. 6.

We are not unmindful of the case of Re Markuson, 5 N. D. 180, 64 N. W. 939, and that in it we said: "We know of no authority which will permit a trial court to postpone from time to time the date at which imprisonment shall go into effect after a valid judgment has been entered, declaring that the imprisonment shall begin at a definite date which is stated in the judgment. The time at which a sentence of imprisonment begins and ends is a matter of the greatest importance, and is so considered by all the authorities. . . . Under § 21, supra, the judgment may be withheld for thirty days upon the terms stated in the statute, and to facilitate a review in the supreme court, but we find no authority anywhere under which the time of taking effect of a judgment of imprisonment as originally pronounced may by orders of the trial court be postponed from time to time for any purpose or under any circumstance." That case, however, was handed down in 1895, and long prior to the enactment of the statute which is now before us, which authorizes the suspension of sentences, and which must, if possible, be upheld and be given a construction which will be in accordance with the provisions of the Constitution.

To construe the statute as granting the power to the trial court to commute a sentence or to pardon the offense would render the statute unconstitutional. To hold that the suspension is indefinite, and only for a reasonable time, and for the purpose of affording the prisoner, if he desires, an opportunity to apply for executive clemency, would render it valid. We so construe it. We hold, indeed, that the statute justifies just such a procedure as was suggested in the Texas court of criminal appeals in Snodgrass v. State, supra. In that case, the court, though holding a statute to be unconstitutional which sought to confer upon the courts the power "to suspend judgment on conviction during the good behavior, and ultimately to annul the judgment," expressly said: "A law can be drawn so that if on the trial it appears that it is

the first offense, and the evidence convinces the judge that the best interests of society, of the individual, and of the state would be served if the hand of the law was stayed and the person adjudged guilty be given a chance to reform, he may recommend to the governor a conditional pardon, *and we are sure that in every deserving case the recommendation would be complied with by the governor.* The people had the confidence in the governor to place this power in his hands, and we, too, have the same confidence. The law could require that he have the court stenographer make a copy of the testimony heard, and require the judge to forward it to the governor, with his recommendation, and provide that the prisoner be not conveyed to the penitentiary until the governor had acted on the recommendation. Thus the end sought may be reached in a way not violative of our Constitution, and all the good features in the law be retained."

The suspension in the case at bar is, in effect, nothing more or less than a recommendation to the board of pardons, and the giving to the defendant an opportunity to obtain clemency from that board. The order was made under the authority of the statute, and therefore does not come within the condemnation of the case of Re Markuson, 5 N. D. 180, 64 N. W. 939. If the defendant has neglected to take advantage of the opportunity offered, she has herself only to blame, and cannot complain if the order is afterwards revoked.

The writ will be quashed.

SPALDING, Ch. J., dissenting. I cannot concur in the conclusion reached by my associates in this case. The result seems to come by reason of a belief that no different conclusion can be reached, and avoid a decision that the statute in question is invalid. To save so holding, it seems to me the court has put an exceedingly strained construction on the meaning and the reasons for the law. I shall not at length review the authorities cited, but on this question simply refer to the case of Snodgrass v. State, — Tex. Crim. Rep. —, 41 L.R.A.(N.S.) 1144, 150 S. W. 162, on which so much reliance seems to be placed. I am unable to discover that it has any application to either the law or the facts before us.

In effect the Texas law wiped out the effect of the conviction, as well as the fact of conviction, and restored the party to practically the same

position in society that he had occupied before the conviction, or would have occupied had he never been convicted. This is why the Texas statute was construed as working a pardon, if valid. Our statute does not contain any such provisions, but, on the contrary, when strictly construed, if the defendant's conduct is exemplary, it leaves a sentence hanging over him during the remainder of his life. The better his conduct the more certain it is that his future must be blighted by a judgment of conviction in a criminal case still suspended over him. It thus becomes a punishment for good conduct rather than for infractions of law, and this only in case of the commission of a minor offense. The court may at any time, either with or without cause, revoke its order of suspension and inflict the punishment prescribed.

The defendant may not have sought a suspension of the execution of the judgment. He may not have desired it. The court may, nevertheless, inflict upon him a punishment far in excess of anything usual or theretofore known in the annals of jurisprudence for the offense committed. To say the least, for a misdemeanor it becomes an unusual punishment. In the case at bar the record discloses that the application for a suspension of execution was made by the state, and not by the defendant. But the Texas case is not authority on the further point to which it is cited.

The Texas court in its opinion suggested that a law might be drawn to cover first offenses, providing for a recommendation by the judge to the governor; that is, a recommendation for a conditional pardon, supported by a copy of the testimony taken on the trial, and a provision that in such case the prisoner should not be conveyed to the penitentiary until action had been had on the recommendation of the judge. This suggestion of the Texas court that a law might be enacted, which by its terms specified that it was for the purpose of enabling the judge to recommend clemency, and staying execution long enough to enable the governor to act, is made a basis of the holding that our statute, which contains none of these provisions, was enacted for the purpose only of giving an opportunity to seek executive clemency.

Its very terms refute any such assumption. It specifies the reasons for the stay or suspension of execution of the judgment. They are: If it appears that it is the first offense, that the character of the defendant and the circumstances are such that the offense is not likely to be re-

peated, and, finally, that the public welfare does not require the imposition of the penalty. It does not authorize the suspension of the execution of the sentence for any reason except those enumerated. Furthermore, if any such intention existed, why should the suspension be permitted for a longer period than necessary to enable the party to apply for clemency, the court to make the recommendation, and the pardon board to act? In no case would a suspension of more than six months be necessary to permit these things to be done. In the case at bar the conviction was had in October; the next meeting of the board of pardons was fixed by law for the 2d day of December following. No application was made for clemency, and none has been made at any of the subsequent meetings of the board. Still further, the record discloses that the execution of the sentence was in fact suspended for an entirely different reason. It was suspended because the defendant was willing to take her departure from the state. It remained suspended for more than a year and until she returned to the state.

For these reasons I cannot concur in the reasoning of the conclusions of my learned brethren on this subject. Neither can I concur in their intimation that, except for imagining that the law were enacted solely with a view to permitting the defendant to apply for executive clemency, it would be unconstitutional. There is a wide difference between the suspension of the execution of sentence, as provided in this statute, and the granting of a pardon or conditional pardon. A pardon is a remission of guilt, and a conditional pardon is one which does not become operative until the grantee has performed some specific act, or which becomes void when some specified event transpires. 1 Bishop, Crim. L. § 914. A remission of guilt reinstates the offender as nearly as possible in the same condition as he would have occupied had he never been charged with committing the offense. A pardon releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as though he had never committed the offense. It makes him, as it were, a new man, and gives him a new credit and capacity; People ex rel. Forsyth v. Court of Sessions, 141 N. Y. 288, 23 L.R.A. 856, 36 N. E. 386, 15 Am. Crim. Rep. 675. This is not true of the suspension of execution of a judgment. In such case the court in effect says: "This is your first conviction. Your record heretofore has been good. The offense is only a misdemeanor. The circumstances

29 N. D.—4.

surrounding it and your relations to society have been such as to indicate that you are not naturally criminal, and that you are not likely to become a confirmed criminal. From these facts it appears that the welfare of society does not demand that at this time the sentence be executed. The policy of the law is to give every person the greatest opportunity for development that due protection to society will permit him to have. Hence you are put on probation. The court will see whether you are disposed to become a criminal, and whether in fact you are entitled to its consideration and society still be protected. We will, therefore, not execute the sentence until we have an opportunity to note your conduct and learn more of your disposition. Should you be guilty of further infraction of law, and not deport yourself as a good citizen at all times within the period for which the sentence was pronounced, the suspension will be revoked, and you will be required to pay the penalty of the offense which you committed and of which you were convicted." This does not constitute a pardon, either full or conditional. It does not absolve him from guilt. It is not a remission. It does not restore to him his rights as a citizen, or wipe out the record of his conviction; the defendant enjoys his liberty outside the walls of the jail, yet he remains under the sentence to which he has been condemned, and may be imprisoned at any time. George v. Lillard, 106 Ky. 820, 51 S. W. 793, 1011.

In my judgment, so long as the statute is construed to not extend the power of suspension beyond the maximum limit of the time for which the defendant was sentenced, by express terms, and does not permit a revocation thereof except within such period, it is valid, and not subject to attack as an invasion of the pardoning power. All that is necessary is to read and construe the statute as applying only to the time during which the sentence would have been running, had there been no suspension. It is then made to harmonize with the modern policy of dealing with criminals for the first time guilty of minor offenses. It gives them an opportunity to prove their worth and that society will not suffer if the full penalty is not executed, and it minimizes the punishment, rather than increases it, as is done by the construction given the statute by my brethren.

Courts do not try criminals and pronounce sentence with reference to what the board of pardons may do in the future. They are guided by

the law. The board of pardons is governed by no law. It exercises its functions whenever in its judgment the ends of justice have been met in a given case. When an offender has served long enough to punish him adequately for the offense committed, and to serve as a warning to others, and thereby protect society, and when at the same time he gives adequate evidence of reformation, the board of pardons may feel justified in acting favorably. But none of these considerations apply to a court. Its action within certain limits is controlled by the law. I am aware that numerous authorities hold that some statutes somewhat similar to the one in question provide for an invasion of the pardoning power, but I think that in each instance the statute was a palpable invasion of that power, or the court failed to distinguish between a pardon and the suspension of execution of judgment, and did not recognize that there is a marked difference.

The pardoning power in this country is not parallel to that in monarchical countries, where the king rules by divine right, and a history of this power in such countries properly sheds but little light upon the subject. For a clear, comprehensive consideration of the subject of the pardoning power in America, see State v. Nichols, 26 Ark. 74, 7 Am. Rep. 600. Because the order suspending the execution of the judgment in this case was not entered until long after the expiration of the six months for which the defendant was sentenced, I am of the opinion that the writ should be granted. Re Markuson, 5 N. D. 180, 64 N. W. 939, is a direct authority on this subject.

Furthermore, it is not necessary to strain the construction to protect the offender. Everything that is attempted to be accomplished by this statute can be done by suspending sentence, which the court has the inherent power to do, as held by nearly all authorities. See People ex rel. Forsyth v. Court of Sessions, supra.