IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 74,357






EX PARTE ANTONIO DWINAL HALE, Applicant






ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM BRAZORIA COUNTY






 Womack, J., delivered the opinion of the Court.



 The issue in this case is whether the applicant should be given credit on a subsequent
sentence for the time during which he was erroneously released on mandatory supervision
when he should have continued to be imprisoned under the previous sentence.

I.


 On November 5, 1991, the applicant was sentenced to seven years in prison for
burglary. On August 8, 1992, he unlawfully carried a weapon in prison, an offense for which
he was sentenced to eight years' imprisonment on September 22, 1994. As the law
requires, the judgment in the weapon case specified that the sentence not begin until the
completion of the first sentence. (1)

 Taking into account a credit for pre-sentence confinement in jail, the burglary sentence began on October 7, 1991. The applicant was not approved for parole on that
sentence, so the law required him to serve the seven-year burglary sentence "day-for-day"
in prison, (2) that is, until October 6, 1998. At that time, the second sentence (for the weapon
violation) should have begun.

 The problem is that the applicant was not in fact confined in prison, serving the
seven-year burglary sentence, until the sentence ended on October 6, 1998. He was
incorrectly released to mandatory supervision twice. On December 12, 1994, he was
erroneously released by prison officials who had not received the commitment papers for
the second sentence. (The papers arrived six weeks after the release.) He stayed out until
February 3, 1996, when he was arrested and returned to prison for violating the terms of
mandatory supervision.

 On October 4, 1996, his release to mandatory supervision on the burglary conviction was reinstated. This action was incorrect, since he should not have been released on
mandatory supervision on any sentence other than the last one (3) -- in this case, the cumulated sentence for the weapon offense. He stayed out on that erroneous release until
February 19, 2001, when he was arrested for violation of conditions of mandatory supervision. (On February 27, 2001, he was sentenced to six months in state jail for unauthorized
use of vehicle.)

II.


 For the time he spent out of prison, the applicant says he should be given credit
against his sentence as though he were in prison. Why? Because, he says, he was not at fault
and cannot be penalized for leaving prison when he was told to do so. We agree that he
should not be penalized for what happened. The question is, would he be penalized by being
required to serve the sentence that was entered against him without credit for the time he
spent at home?

 This question was answered without difficulty when it first arose, in 1891, in Ex
parte Wyatt. "The fact that he was allowed to go at large by the sheriff illegally for more
than 10 days, and that if during that time he had been in prison the judgment would have
been discharged, does not give him the right to claim a discharge simply on account of the
fact that the 10 days for which he should have been imprisoned had already elapsed." (4) We
adhered to that answer for forty years or more. (5)

 Without referring to those decisions, we gave a different answer in 1953 with our
decision in Ex parte Griffin. (6) In Griffin, we quoted a statement made by the Oklahoma
Court of Criminal Appeals' in 1913 that a jail inmate "did no more than any other intelligent human being would have done under like circumstances -- that is, to go home when
the court who had sentenced him, the county attorney who had prosecuted him, and the
sheriff who had incarcerated him told him he could do so." (7)

 When the conflict between Griffin and the earlier decisions was pointed out later in
1953, in Ex parte Morgan, we distinguished the decisions by referring again to Griffin's
lack of fault. We also added a second reason.

 In the Wyatt case it was the prisoner who asked for the leniency which
we held the sheriff had no authority to grant him. This was not so in the
Griffin case. There the judge sent the officer to bring the prisoner before
him, and then told the prisoner to go home just as was done in the case at bar.

 Therein lies the distinction that we tried to make clear in the Griffin
case.

 Any other holding than that in the Griffin case and this case would be
fundamentally unsound for two reasons: (1) It would require one who had
requested no relief, but who had been told to leave his place of confinement
by those who confined him, to refuse to leave and demand that he be allowed
to finish serving his sentence at that time in order to ever be free from the
clutches of the law. Such conduct on the part of a prisoner would be inconsistent with human nature as we know it. (2) It would place in the hands of those
charged with enforcing the law the power to keep a prisoner in a form of
peonage by requiring him to serve his sentence at whatever times and for
such length of time as the whim of the officer might dictate. (8)


 The first reason says nothing more than already has been said, and to which all agree:
such a prisoner has done nothing wrong and should not be penalized. It advances not one
step toward deciding whether requiring the prisoner to serve his sentence would be such a
penalty. The first flaw in our Griffin decision is that it stopped at the first step of the
reasoning.

 The decision of the Oklahoma Court on which we relied in Griffin made no such
mistake. After taking the first step of the analysis, which was that the prisoner was released
without fault on his part, the Oklahoma Court gave the reason for its holding. In the Oklahoma case, a county court sentenced a person to serve 30 days in jail and to pay a $50 fine,
but the court apparently ordered him released later that day, which it had no authority to do. (9)
About four months later the court issued another commitment to jail, and the prisoner
sought habeas corpus. The Oklahoma Court of Criminal Appeals gave him relief, saying:

 [A] rule could not be established, technical or otherwise, holding him to be an
escape [sic] and liable to reincarceration, without placing in the hands of
county courts, sheriffs, and prosecuting attorneys the power to defeat every
judgment of a court of record entered in this state, and permit them to harass
and impose upon the unfortunate members of our citizenship, who happen to
be convicted and sentenced for crime, during an endless period, by placing
them in jail today and releasing them to-morrow, with or without cause, as
their caprice might suggest. The petitioner in this case was in the custody of
the sheriff and subject to his call at all times until the expiration of the prison
sentence, and was in legal effect a "trusty." We do not suggest that the action
of the officers was prompted to by corrupt motives, but it makes no difference what prompts the act; the rule of law is the same. There is no statute
authorizing such conduct, and there should be none. (10)


 Here the Oklahoma court said what we reiterated in our second reason in Morgan,
that the decision is necessary to protect prisoners from being harassed by release and
reimprisonment. None of these statements is true today. It is time to reexamine these
reasons in light of changes in our constitutions and statutes.

 Today Texas has statutes that authorize the release of prisoners to mandatory
supervision by the executive branch of state government. (11) The actions in our case were
erroneous exercises of an authorized power. They were not unconstitutional exercises of
the executive power of clemency by local officials. They did not place in the hands of
county courts, sheriffs, and prosecuting attorneys the power to defeat every judgment of a
court of record in our state.

 In fact, since the Oklahoma court's decision in 1913, the power to release prisoners
on conditions has been given to trial courts (12) as well as the executive.

 Like the Oklahoma court's holding, the holding of this Court in 1912 was that a
judicial release of a convicted person was an intrusion on the executive power. The first
suspended-sentence legislation, which was enacted in 1911, (13) was held unconstitutional
because it infringed on the executive's power to pardon after conviction. The defect in the
act was that, after the jury had assessed punishment, the trial judge was to decide whether to
suspend the sentence. The Court of Criminal Appeals found this discretion "but an indirect
exercise of the power to pardon," which was reserved to the executive. (14)

 The legislature responded with the Suspension of Sentence Act of 1913, (15) which is
usually called "the Suspended Sentence Law." It took the discretion away from the judge by
requiring the suspension of sentence when the jury recommended it in their verdict. This
act was found to be within the legislature's constitutional power to fix the punishment for
crimes, and within the judiciary branch's authority to assess punishment. (16) The present
statute that authorizes "jury-recommended" probation (17) is the descendant of the Suspension
of Sentence Act.

 In 1931 when a statute gave the courts the power to receive a plea of guilty in a
felony case without a jury, the same statute also gave them authority, without the verdict of
a jury, to suspend a sentence that was not more than five years in felony cases other than
murder, perjury, burglary of a private residence at night, robbery, arson, incest, bigamy,
seduction, or abortion. (18) This Court never addressed the constitutionality of the 1931 act. In
order to remove any doubt about whether the 1931 act intruded on the governor's power to
pardon, the executive article of the Texas Constitution, Article IV, was amended by the
addition of section 11A in 1935:

 The Courts of the State of Texas having original jurisdiction of criminal
actions shall have the power, after conviction, to suspend the imposition or
execution of sentence and to place the defendant upon probation and to reimpose such sentence, under such conditions as the Legislature may prescribe.


This section has been described as a limited authority for the courts to grant clemency. (19) It
was not self-enacting, and it required enabling legislation. (20)

 The first legislation that gave judges a general authority to grant probation was the
Adult Probation and Parole Law of 1947. (21) The probation that was authorized by that statute
was essentially like today's community supervision.

 When the Code of Criminal Procedure was revised in 1965, the probation portion of
the Adult Probation and Parole Law of 1947 became Article 42.12 of the Code of Criminal
Procedure, and the old Suspension of Sentence Act was repealed. (22)

 These laws evince a decision by the people, expressed through their constitution and
representatives, that society is well served by conditional release from jail and prison.

 In each form of conditional release (probation, parole, and mandatory supervision)
no credit against a sentence is given for the time spent on conditional release.

 Also since 1913, the Constitution of our country has been interpreted to protect
persons who are released, from reincarceration without due process of law. (23) These
constitutional holdings protect a convicted person from Griffin's spectre of the jailer who,
acting on "caprice," would "harass" him by releasing and reincarcerating him will-he, nil-he. (24)

 It is common that persons who have been conditionally released are incarcerated
after a violation of the conditions of release. (25) They are required to serve their sentences
without credit for the time spent in release. Yet no one with any experience in the processes of criminal law can doubt that the overwhelming majority of defendants prefer to be
conditionally released rather than incarcerated. They do not see these releases as a system
for officers of government "to harass and impose upon the unfortunate members of our
citizenship, who happen to be convicted and sentenced for crime, during an endless period,
by placing them in jail today and releasing them to-morrow, with or without cause, as their
caprice might Conditional releases are highly desired alternatives to incarceration. For the
overwhelming majority of defendants, release is not the penalty; incarceration is. Our files
do not bulge with petitions from prisoners complaining of being punished by being
released, and demanding to be imprisoned.

 The Oklahoma court said an inmate who was released without authority of law
should be thought of as a "trusty," an inmate who is incarcerated but is given lesser
restriction on his freedom so that he can perform tasks for the jail or prison. That characterization may have been the best analogy under the law of Oklahoma in 1913, but it is
completely wrong for our case under our law in our time. A person who is erroneously
released under supervision is not a trusty inmate; he is a releasee who is serving an
unauthorized conditional release. The law that should apply to such a person is not the law
that governs inmates; it is the law that governs releasees.

 During the years that have passed since our Griffin decision, constitutional and
statutory law has changed so greatly that its reasoning simply fails to apply. We overrule
that outmoded case and other cases that have repeated its holding, (26) and we disapprove the
recitation of its reasoning as dicta in other cases. (27)

IV.


 The limits on the period of conditional release are set by statute. For mandatory
supervision, the period "is computed by subtracting from the term for which the inmate was
sentenced the calendar time served on the sentence." (28) A person may not be supervised
after that period expires. Under the law that was applicable to a releasee at the time that the
applicant's release was revoked, "If a person's parole, mandatory supervision, or conditional pardon is revoked, the person may be required to serve the remaining portion of the
sentence on which the person is released. The remaining portion is computed without credit
for the time from the date of the person's release to the date of revocation." (29)

 In the present case, the applicant's seven-year burglary sentence began on October 7,
1991. He was erroneously released to mandatory supervision on December 12, 1994. (30) At
that point, the applicant had served 1162 days of his 2557-day sentence. He was arrested
for violating the conditions of mandatory supervision on February 3, 1996, and he remained
incarcerated for 244 more days, which brought the total length of his incarceration for the
burglary offense to 1406 days. Then, on October 4, 1996, he was again erroneously
released to mandatory supervision. He remained on this second release until he was
arrested for a new offense (unauthorized use of a motor vehicle) on February 18, 2001 -
1598 days later. That is 447 days after the applicant's period of supervision on the burglary
offense would have expired, had his release been proper.

 Because we hold that the statute that should apply to the applicant is the statute that
applied to prisoners who were released on mandatory supervision at the time the applicant
was erroneously released, we hold that the applicant's burglary sentence was discharged
when his period of supervision on that sentence would have expired.

 At the time that the burglary sentence was discharged, the applicant's stacked
sentence for the weapon offense should have started, but because he was not incarcerated,
the time credit accrued only toward his period of supervision. Had the applicant spent the
next eight years on supervision without a violation of his conditions, he would have
discharged his weapon sentence as well. Instead, because his supervision was revoked, he
was not eligible for credit under the statute that applied to prisoners who were released at
the time he was released. (31) Therefore the applicant accrued no credit toward incarceration
on the weapon sentence for his time spent on release. 

 We hold that the sentence for the applicant's burglary offense has expired and that
he began accruing incarceration credit on the sentence for the weapon offense when he was
arrested on February 18, 2001.

 All other relief requested in this application is denied.

 

En banc.

Filed October 8, 2003.

Publish.
1. "If a defendant is sentenced for an offense committed while the defendant was an inmate in the
institutional division of the Texas Department of Criminal Justice and the defendant has not completed
the sentence he was serving at the time of the offense, the judge shall order the sentence he was serving
for the subsequent offense to commence immediately on completion of the original offense." Tex. Code
Crim. Proc. art. 42.08(b).
2. See Ex parte Kuester, 21 S.W.3d 264 (Tex. Cr. App. 2000). Accord, Ex parte Millard, 48
S.W.3d 190, 193 (Tex. Cr. App. 2001).
3. See Ex parte Ruthart, 980 S.W.2d 469, 473 (Tex. Cr. App. 1998) ("an inmate serving
consecutive sentences is not eligible for mandatory supervision on any but the last of his consecutive
sentences").
4. Ex parte Wyatt, 29 Tex. App. 398, 400, 16 S.W. 301, 301 (1891).
5. See Ex parte Cooper, 115 Tex. Crim. 620, 621, 27 S.W.2d 159, 159 (1930) (unauthorized
release by sheriff); Ex parte Lawson, 98 Tex. Crim. 544, 544, 266 S.W. 1101, 1101 (1924)
(unauthorized release by federal prison).
6. 158 Tex. Crim. 570, 258 S.W. 324.
7. Id. at 572, 258 S.W.2d at 325 (quoting Ex parte Eley, 9 Okla. Crim. 76, 80, 130 P. 821,
823 (1913)).
8. Ex parte Morgan, 159 Tex. Crim. 241, 246-47, 262 S.W.2d 728, 731 (1953).
9. "When a judgment is pronounced and no appeal taken, and a commitment issued and the
prisoner delivered to the custody of the county jailor, there are only three ways for him to be released
lawfully until the judgment is satisfied: First, by habeas corpus, on the ground that the judgment is void;
second, by order of the court, when the judgment is vacated or set aside upon lawful grounds; third, by
parol or pardon from the Governor." Ex parte Eley, 9 Okla. Crim. at 79, 130 P. at 822. 
10. Id., at 80-81, 130 P. at 822.
11. See, e.g., Tex. Gov't Code § 508.147.
12. See, e.g., Tex. Const. art. IV, § 11A ("probation"); Tex. Code Crim. Proc. art. 42.031
("work release program"); id., art. 42.033 ("sentence to serve time during off-work hours"); id., art.
42.034 ("county jail work release program"); id., art. 42.035 ("house arrest"); id., art. 42.036
("community service"); id., art. 42.12 ("community supervision").
13. Act of March 11, 1911, 32nd Leg., R.S., ch. 44, 1911 Tex. Gen. Laws 67.
14. Snodgrass v. State, 67 Tex. Crim. 648, 150 S.W. 162, 166 (1912). 
15. Act of February 11, 1913, 33rd Leg., R.S., ch. 7, 1913 Tex. Gen. Laws 8.
16. See Baker v. State, 70 Tex. Crim. 618, 158 S.W. 998 (1913).
17. Tex. Code Crim. Proc. art. 42.12, § 4.
18. See Act of April 9, 1931, 42nd Leg., R.S., ch. 43, § 4, 1931 Tex. Gen. Laws 65, 66.
19. See State ex rel. Smith v. Blackwell, 500 S.W.2d 97, 101 (Tex. Cr. App. 1973) ("This
section of the Constitution is a limited grant of clemency to the courts by the people and does not
encompass the general authority to grant commutation and pardons").
20. State v. Klein, 154 Tex. Crim. 31, 224 S.W.2d 250 (1949).
21. Act of June 21, 1947, 50th Leg., R.S., ch. 452, 1947 Tex. Gen. Laws 1049.
22. See Code of Criminal Procedure Act, 59th Leg., R.S., ch. 722, § 1, art. 54.02, sec. 1, 1965
Tex. Gen. Laws, vol. 2, 317, 563. The parole portion of the 1947 Adult Probation and Parole Law is
now in Tex. Gov't Code ch. 508.
23. See Morrissey v. Brewer, 408 U.S. 472 (1972) (parole revocation). Accord, Gagnon v.
Scarpelli, 411 U.S. 778 (1973) (probation revocation).
24. See Ex parte Griffin, 9 Okla. Crim. at 80-81, 130 P. at 822, quoted above at 5; Ex parte
Downey, 471 S.W.2d 576 (Tex. Cr. App. 1971) (adopting statements in White v. Pearlman, 42
F.2d 788 (10th Cir. 1930), that a rule to the contrary would subject prisoners to "peonage" at the
"whim" of jailers).
25. In State Fiscal Year 2002, 54,725 motions to revoke probation were filed in the district
courts, 29,261 of which were granted, 19,311 of which were denied, and 7,232 of which were
otherwise disposed of. Office of Court Administration, Texas Judicial System Annual
Report -- State Fiscal Year 2002 157 (2002). The Department of Criminal Justice took in --
"between the state jail and institutional division -- more than 50,000 people a year . And about
21,000 of those are probation revocations, and about 11,000 are parole revocations." Gary Johnson,
Executive Director, Texas Department of Criminal Justice, quoted in Ed Timms, Study Projecting
Surge in Inmates, Dallas Morning News, Jan. 15, 2003, at 1A.
26. Ex parte Busby, 67 S.W.3d 171 (Tex. Cr. App. 2001) (credit for period of shock probation
that trial court granted after its jurisdiction had expired); Ex parte Millard, 48 S.W.3d 190 (Tex. Cr.
App. 2001) (credit for period of parole after erroneous release); Ex parte Dunn, 976 S.W.2d 208
(Tex. Cr. App. 1998) (credit for period on bail pending appeal, but only after the time the applicant
notified the trial court of his whereabouts); Ex parte Smiley, 730 S.W.2d 757 (Tex. Cr. App. 1987)
(credit for period of mandatory supervision when no detainer from another charge had been sent to the
prison); Stasey v. State, 683 S.W.2d 705 (Tex. Cr. App. 1985) (credit for premature portion of
shock probation that trial court granted before it had jurisdiction); Ex parte Hudson, 655 S.W.2d 206
(Tex. Cr. App. 1983) (credit for time of erroneous release from the jail of another county); Ex parte
Morris, 626 S.W.2d 754 (Tex. Cr. App. 1982) (per Teague, J., with seven judges concurring in the
result) (attempting to rephrase the rule); Ex parte Hurd, 613 S.W.2d 742 (Tex. Cr. App. 1981)
(credit for time of release from prison because no detainer was sent to prison); Ex parte Pizzalota,
610 S.W.2d 486 (Tex. Cr. App. 1980) (credit for time of release from prison in disregard of detainer);
Ex parte Tarlton, 582 S.W.2d 155 (Tex. Cr. App. 1979) (credit for time of release from prison after
county of subsequent conviction failed to notify prison that appeal had been withdrawn); Ex parte
Bates, 538 S.W.2d 790 (Tex. Cr. App. 1976) (credit for time of release from prison after county of
subsequent conviction failed to notify prison that conviction had been affirmed on appeal); Ex parte
Esquivel, 531 S.W.2d 339 (Tex. Cr. App. 1976) (same); Ex parte Downey, 471 S.W.2d 576 (Tex.
Cr. App. 1971) (credit for time of release from prison when notification of subsequent conviction had
not yet arrived at prison); Ex parte Morgan, 159 Tex. Crim. 241, 262 S.W.2d 728 (1953) (credit for
time of release from jail after sentence when trial court, without authority, ordered release).
27. These include Ex parte Kuester, 21 S.W.3d 264, 272 (Tex. Cr. App. 2002) (stating the rule
in dictum), and Ex parte Iglehart, 535 S.W.2d 185 (Tex. Cr. App. 1976) (no credit for time of
release during which applicant contested extradition).
28. Tex. Gov't Code § 508.148.
29. Id., § 508.283(c) (enacted by Act of May 21, 1997, 75th Leg., R.S., ch. 165, §12.01, sec.
508.283, 1997 Tex. Gen. Laws 327, 435-46), relettered subsection "(b)" by Act of May 10, 1999,
76th Leg., R.S., ch. 62, § 10.34, 1999 Tex. Gen. Laws 127, 333, amended for revocations that
occur on or after September 1, 2001 by Act of June 14, 2001, 77th Leg., R.S., ch. 856, § 7, 2001
Tex. Gen. Laws 1704, 1705.
30. He was not paroled, however, so the stacked sentence for the weapon charge did not start at
this time.
31. See note 29 and accompanying text, supra.